HOECHST CELANESE CORPORATION and Celanese Engineering Resins, Inc., corporations of the State of Delaware, Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, et al., Defendants.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, et al., Third–Party Plaintiffs,

v.

CENTAUR INSURANCE COMPANY, et al., Third–Party Defendants.

Superior Court of Delaware, New Castle County.

Date Submitted: April 24, 1992.
Date Decided: June 17, 1992.

---

Richard E. Poole and David J. Baldwin of Potter, Anderson & Corroon, Wilmington, for plaintiffs.

Howard M. Berg, Paul Cottrell, and Diane J. Bartels of Berg, Tighe & Cottrell, Wilmington, coordinating counsel for defendants.

## OPINION

GEBELEIN, Judge.

Certain high level excess insurer defendants have moved to dismiss the complaint filed in this declaratory judgment action on

the basis that no justiciable controversy exists between them and plaintiffs. For the reasons set forth below the motions are denied.

### Background

On September 8, 1989, plaintiffs Hoechst Celanese Corporation and Celanese Engineering Resins, Inc. (collectively, "HCC") filed this comprehensive action seeking a declaratory judgment determining its rights and the duties of numerous primary, umbrella and excess general liability insurers with respect to products liability claims against HCC arising from the manufacture of Celcon®.

Celcon® is an acetal copolymer resin which was, during the period 1978 through 1987, used by various HCC customers to make insert plumbing fittings for use with polybutylene pipe. Plumbing systems containing Celcon® fittings were installed in thousands of residential units and recreational vehicles across the United States. A number of homeowners, contractors, plumbers, and developers have allegedly experienced high, premature failure rates of plumbing systems which they allege to be caused by the Celcon® fittings. As a result, HCC has been named as a defendant or third-party defendant in numerous actions and has also received a significant number of out-of-court claims.

On January 17, 1991, defendant Aetna Casualty & Surety Company and certain other defendants [1] filed a motion to dismiss claims against certain high level excess insurers for lack of justiciability. Certain other defendants filed separate motions [2] to dismiss on similar grounds or joinders [3] to those filed by the other defendants. Two defendants moved to stay discovery on the ground that HCC's claims were not ripe. The Court will refer to these defendants *en masse* since their motions rest on similar grounds.

It appears that HCC's primary level liability coverage during the years in question was $2 million per year and that HCC's umbrella level insurance provided an additional $5 million of coverage per year. The excess layer policies are not implicated until these coverages are exhausted and become effective at levels ranging from $7 million to $152 million of claims in a single policy year. The moving defendants contend that excess insurers who provided coverage above the $20 million level [4] should

---

1. Aetna Casualty & Surety Company, Allstate Insurance Company (successor to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company), American Centennial Insurance Company, American International Underwriters (AIU Insurance Company), American Reinsurance Company, Associated International Insurance Company, Birmingham Fire Insurance Company, California Union Insurance Company, Cigna Insurance Company, City Insurance Company, Columbia Casualty Company, Employers Mutual Casualty Company, ERIC Reinsurance Company, Federal Insurance Company, Fireman's Fund Insurance Company, First State Insurance, Government Employees Insurance Company, Harbor Insurance Company, Hartford Accident & Indemnity Company, Highlands Insurance Company, Home Insurance Company, Hudson Insurance Company, Illinois Insurance Exchange defendants, Insurance Company of North America, Lexington Insurance Company, London Guaranty & Accident Company, National Casualty Company, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, New England Insurance Company, New England Reinsurance Company, North River Insurance Company, Pacific Insurance Company, Pacific Insurance Company, Royal Indemnity Company, Twin

City Fire Insurance Company, and Underwriters Reinsurance Company (formerly Buffalo Reinsurance Company).

2. Certain Underwriters at Lloyd's London and London Market Insurance Companies, Zurich Insurance Company, X.L. Insurance Company, Ltd.

3. Columbia Casualty Company, Employers Insurance of Wausau.

4. A few of the excess carriers seek dismissal of *all* excess carriers on the basis that HCC has never, apart from this litigation, notified the excess insurers of a claim or sought payment of benefits from the excess carriers. These carriers allege that they have therefore been unable to investigate the claims or to express any position as to coverage. These defendants assert that they have been forced to rely on every possible policy exclusion and condition as defenses to the complaint filed by plaintiffs. Therefore, these carriers contend, not only have plaintiffs failed to show that the excess layers will be reached, they have failed to show that these carriers' positions as to coverage will actually be adverse. See "Statement of Position of Co-Defendants Certain Underwriters at Lloyd's

be dismissed because HCC has failed to establish a reasonable likelihood that HCC's damages from the underlying plumbing products liability claims will ever reach such levels. If the Court were to grant the motion as to coverage above the $20 million level, twenty-eight (28) defendants would be dismissed and an additional fifty-eight (58) policies provided by other defendants would be removed from this litigation.

In support of their motion, defendants offered the affidavit of Stephen Braga, Esquire, counsel for defendant Aetna Casualty & Surety Company. Braga reviewed the claims summaries which had been provided by HCC to the insurers, and concluded that as of November 1990, HCC had incurred *total* liabilities of less than one-tenth of the coverage available for a single year. Defendants contended that HCC had failed to show

> any likelihood that all of the high level excess insurance policies sued upon herein will ever be implicated by [HCC's] liability for the plumbing claims. Here, we have excess level insurance policies at *yearly* multi-million dollar levels of $5 million, $20 million, $45 million, $50 million, $75 million, $80 million, $100 million, and $150 million being sued upon and yet—well *over three years after* [HCC's] product was allegedly discontinued for use ... [HCC's] total actual liabilities to date for all of the years at issue only falls within the bottom ranges of such coverage.[5]

In response to defendants' assertions, HCC offered the affidavit of Frank Israel, associate general counsel for Hoechst Celanese Corporation. Israel made various projections of future claims, settlements, and judgments against HCC and asserted that the policies written for HCC by high level

excess insurers would be implicated. After considering the affidavits and the arguments of counsel, the Court reserved decision so that additional discovery of Mr. Israel could be taken to aid the Court in determining the bases for the projections made in the affidavit. The parties deposed Israel for two days and filed supplemental memoranda to update the previous briefing of this issue. The issue is now ripe for decision.

### The Ripeness Requirement

 The declaratory judgment statute, 10 *Del.C.* § 6501, does not create any substantive rights but merely provides a procedural means for securing judicial relief in an expeditious and comprehensive manner. *Stabler v. Ramsay*, Del.Supr., 88 A.2d 546 (1952). Jurisdiction to award declaratory relief exists only in a case of "actual controversy":

> In cases of actual controversy, ... the Superior Court ... may declare rights and other legal relations of any interested parties [party] petitioning for such declaration, whether or not further relief is or could be prayed....

10 *Del.C.* § 6501; *see also Schick Inc. v. Amalgamated Clothing and Textile Workers Union*, Del.Ch., 533 A.2d 1235 (1987); *Monsanto Co. v. Aetna Cas. and Surety Co.*, Del.Super., 565 A.2d 268 (1989) ("*Monsanto*"); *North American Philips Corp. v. Aetna Cas. and Surety Co.*, Del.Super., 565 A.2d 956 (1989) ("*NAPC*").

 In order for a controversy to merit declaratory relief, it must satisfy four requirements: (1) it must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted

---

and London Market Insurance Companies ...," filed January 17, 1991. The Court finds this particular assertion to be without merit. Despite these carriers' asserted inability to investigate the claims, they have filed answers denying coverage on the basis of a number of policy exclusions and conditions which are consistent with those raised as defenses by the other carriers. These excess carriers, like the others, have interests adverse to those of plaintiffs HCC. The Court will hereafter confine its discussion

to the excess carriers' arguments that the higher levels are not likely to be implicated.

5. Memorandum of Points and Authorities in Support of the Motion of Defendant Aetna Casualty & Surety Company and Various Other Defendants to Dismiss Certain High Level Excess Policy Claims from this Litigation, filed January 17, 1991, at 10.

against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial declaration. *Marshall v. Hill,* Del.Super., 93 A.2d 524 (1952); *Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.,* Del.Super., 564 A.2d 681, 687 (1989) (*"Playtex"*). The excess insurers contend that the fourth requirement, ripeness, is not met in this action as to them because plaintiffs have failed to show that their damages are likely to implicate coverage above the $20 million level.

■ In determining whether an issue is ripe for adjudication, the Court must balance between two competing interests. First, the Court must consider the purpose of the Declaratory Judgment Act, to provide early and comprehensive resolutions of disputes. This interest must be weighed against the policies of judicial economy and restraint. The Court's discretion is guided by the following factors identified by the Court of Chancery in *Schick:*

(1) a practical evaluation of the legitimate interests of the plaintiff in a prompt resolution of the question presented;

(2) the hardship that further delay may threaten;

(3) the prospect of future factual development that might affect the determination made;

(4) the need to conserve scarce resources; and

(5) a due respect for identifiable policies of law touching upon the subject matter in dispute.

*Schick, supra* at 1239. The Court must make a practical judgment as to whether the dispute has matured to the point at which judicial action is appropriate:

The law of ripeness, once a tangle of special rules and legalistic distinctions, is now very much a matter of practical common sense.... What is required is that the interests of the court ... in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of

those who seek relief from the challenged action's "immediate and practical impact" upon them.

*Continental Air Lines, Inc. v. C.A.B.,* 522 F.2d 107, 124–125 (D.C.Cir.1975) (citing *Frozen Food Express v. United States,* 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956)). A litigant need not have suffered actual harm, but an actual controversy must exist so that judicial resources are not wasted on hypothetical disputes or on situations in which a judicial declaration will not end the dispute between the parties. *Playtex, supra* at 686 (citing *Heathergreen Commons Condo. Ass'n v. Paul,* Del.Ch., 503 A.2d 636 (1985)).

■ In the context of an insurance coverage action, absolute proof that an excess insurer's policies will be triggered is by no means required in order to establish a ripe controversy. *Monsanto,* 565 A.2d at 275. However, the Court may dismiss a defendant when the plaintiff does not show a reasonable likelihood that the claims will mature as to that defendant. In such a case, it would be a waste of judicial resources and an unnecessary expense to the parties to force excess insurers to defend a coverage action when their coverage is unlikely to ever be implicated.

Plaintiffs contend that under *NAPC* and *Monsanto,* the mere allegation that the underlying coverage has been exhausted and that the excess policies will be implicated is sufficient to make a controversy ripe for adjudication. *Monsanto Co. v. Aetna Cas. & Surety Co.,* Del.Super., 565 A.2d 268 (1989). The Court does not read *Monsanto* so broadly. The Court may examine the circumstances of each case to determine the likelihood that certain claims will mature and whether, in view of the resources of the Court and the expense of the litigation to the parties, it is appropriate to address those claims. While this Court in *Monsanto* considered the fact that Monsanto had alleged exhaustion of the underlying policies, the Court also considered the factual circumstances in finding that Monsanto's potential liability created a ripe controversy as to the excess carriers.

In this instance, the moving defendants have no present obligation to pay benefits under the policies. Plaintiffs have not alleged exhaustion of the underlying coverage provided by the primary carrier Northwestern National for policy years from January 1, 1978 through April 1, 1985. Most, if not all, of the excess insurance policies contain a "no duty to defend" clause and many of the moving defendants are therefore not responsible for the defense of HCC in the underlying actions. The issue is whether there is a sufficient likelihood that the underlying coverage will be exhausted and the excess coverage implicated in any one policy year so as to present an actual controversy to the Court and require the presence of the excess insurers in this litigation.

### The Israel Affidavit and Deposition

In order to demonstrate this likelihood, HCC offered the affidavit of Mr. Israel in which he made a number of liability projections. Israel based these projections on statistics regarding the number of claims filed to date and their sources, the average settlement contribution by HCC, anticipated legal fees, and other variables. These projections were made for a five year period. The Court ordered a deposition of Mr. Israel in order to determine the degree of speculation present in that affidavit.

The Court will not dwell on the details of Mr. Israel's affidavit and deposition testimony, much of which is confidential. However, the Court is immensely displeased by the manner in which the affidavit was prepared and executed. After reviewing Mr. Israel's deposition testimony, it is abundantly clear to the Court that Mr. Israel did not have personal knowledge of the statements made in his affidavit. He was not responsible for gathering the necessary information or making the necessary adjustments and calculations. Nor was he responsible for determining the method in which the projections would be made or the time period which would be used for the projections.

Mr. Israel was frequently unable to remember how he arrived at figures such as the average settlement cost. He conceded that he usually "rounded up" the various figures, although he did not specify what method he used or to what degree the figures were "rounded up." He admitted that most of the information and document-gathering, as well as the necessary calculations, were in fact performed not by him but by a paralegal, Linda Hahn. He could not explain why a five year period was chosen for the projections, only that it was suggested by plaintiffs' counsel.

He could not produce the documents, notes, or calculations used, explaining that they were simply discarded after he signed the affidavit. He was aware of no studies to determine what percentage of Celcon® products allegedly fail. Nor was he aware of any information about the average period of time which elapses before such alleged failures. Israel's projections did not take into account the possibility that the claim rate might change due to the fact that the allegedly faulty Celcon® was taken off the market several years ago, nor did they account for the possible effect of statutes of limitations. In some cases, Israel could not indicate what years certain figures represented. He did not distinguish the different types of claims and the different damages which might be attributed to each type.

The "average" settlement figure was not in fact a mathematical average at all, but merely Mr. Israel's guess. In some cases, Israel had failed to account for HCC's sharing arrangements with other defendants in the underlying cases. In sum, Mr. Israel's sworn affidavit, which was prepared by plaintiffs' counsel, was not based on his personal knowledge, was not supported by adequate data or methodology, and appears to have been rife with speculation. If the affidavit were the sole basis for this Court's decision, the motion to dismiss would be granted.

### Application of Ripeness Standard

However, there are strong indications, apart from HCC's speculative projections, that at least some of the excess coverage will be reached. Although the Court has

little confidence in the plaintiffs' projections about what will happen in the future, it cannot ignore the history of the factual developments in this litigation.

As of October 1989, HCC had expended several million dollars in settlements and judgments [6] with respect to the plumbing claims.[7] As of November 1990, that figure increased by approximately 400%.[8] As of March 1992, the figure for amounts expended again increased by approximately 400%.[9] These figures represent significant increases in the amounts expended by HCC and easily exceed, several times over, the $20 million cutoff suggested by the moving defendants.

Furthermore, there are recent developments in the underlying plumbing litigation which may significantly increase HCC's liability and consequently its' claims against the defendants. In addition to the many thousands of plumbing claims filed with respect to various housing units, it now appears that HCC will face claims resulting from the alleged failure of plumbing systems containing Celcon® which were installed in many thousands of recreational vehicles. The potential liability from the RV litigation is impossible to predict at this stage.[10] However, it is probable that these claims will increase the damages claimed by HCC to some degree and this makes it even more likely that higher levels of coverage will be reached.

It also appears that HCC may be forced to bear a larger share of the settlements and judgments in the underlying cases because of financial problems experienced by U.S. Brass, which is a co-defendant of HCC in many of the underlying actions and has in the past paid some portion of the settlements under defense sharing agreements. U.S. Brass has apparently ceased to contribute to the Qest Fund which was set up to handle Celcon®-related complaints from homeowners. Again, it is difficult for the Court to predict the effect of U.S. Brass' problems upon this litigation, but this development increases the potential damages in this litigation to some degree.

It is unsettled how claims would be allocated among the various defendants and policy years, if the coverage issues are resolved in HCC's favor, because the substantive issues of trigger of coverage and allocation have not been resolved. HCC has asserted that it may choose which of the triggered policy years it wishes to invoke and spread the losses "vertically" in one or more policy years rather than "horizontally" across the policy years, and this would therefore implicate the higher layers of coverage. HCC asserts that under the "pay all sums" provision of the policies, the insurers with like coverage for the same policy year are jointly and severally liable to HCC. Therefore HCC would be entitled to select a window period of coverage from certain insurers and those insurers would have to seek contribution from insurers with like liability in a subsequent or third-party action. *See Reading Co. v. The Travelers Indem. Co.*, No. 87–2021, 1988 WL 13242 (E.D.Pa. Feb. 18, 1988); *Zurich Ins. Co. v. Northbrook Excess & Surplus Ins. Co.*, 145 Ill.App.3d 175, 98 Ill.Dec. 512, 523–24, 494 N.E.2d 634, 645–46 (1986), *aff'd, Zurich Ins. Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684,

**6.** Attorney's fees and other defense costs are irrelevant because they are not sums which would exhaust the limits of the underlying policies.

**7.** Affidavit of Rosalind Miller, Director of Risk Management of HCC, October 16, 1989.

**8.** Affidavit of Stephen Braga, Esquire.

**9.** Plaintiffs now present new projections and a settlement and judgment analysis in an effort to confirm the estimates and projections made in the Israel affidavit and indeed, attempt to demonstrate that the earlier estimates were overly conservative. Given the Court's review of Mr. Israel's methods, this decision rests in no way on those projections.

**10.** The parties dispute whether these claims are relevant to this litigation. Apparently some defendants take the position that the Complaint filed by plaintiffs does not make a claim for coverage of HCC's damages resulting from the RV-related litigation. It appears to the Court that if the Complaint does not cover these claims, they could be added by an amendment to the complaint. Therefore the Court must address the impact of these claims upon this litigation and the issue currently before the Court.

514 N.E.2d 150 (1987); *Sandoz, Inc. v. Employer's Liability Assurance Corp.,* 554 F.Supp. 257, 266 (D.N.J.1983).

Since this issue has not been presented to the Court for a substantive ruling, the Court must assume for the purposes of the motions to dismiss that HCC's theory might be applied. Under HCC's theory, HCC might invoke a single policy year of coverage to satisfy all or much of its liability. Defendants point out that regardless of the trigger of coverage, the plumbing claims will be spread out to some degree across the eleven potential policy years.[11] The issue cannot be resolved at this juncture. The Court must at least consider the various possibilities, including plaintiffs' theory. One thing is clear: at this point, HCC has allegedly incurred damages in an amount which, if assigned to a single policy year, would implicate some of the coverage provided by carriers who seek dismissal from this action.

### Conclusion

■ Given HCC's allegations and the circumstances of this litigation, it appears to the Court that HCC has demonstrated a sufficient likelihood that at least some of the higher level excess coverage might be implicated so as to warrant the inclusion of the moving defendants in this litigation. The Court is unable to draw a line above which it can be said with any precision or certainty that coverage is unlikely to be implicated. Such demarcation being impracticable, the principles of judicial economy and comprehensive, final resolution require that all of the excess insurers potentially implicated remain in this action.

Defendants argue that their dismissal would not prejudice the plaintiffs in any manner since they could be brought back into the litigation should it appear more likely that their coverage will be implicated. This rather specious argument ignores the obvious prejudice that HCC would suffer in having to relitigate against these defendants those issues which had arisen during their absence from the case and the expense of duplicative discovery and trial preparation. It also ignores, of course, the need to conserve this Court's scarce resources.

■ An excess insurer who seeks dismissal has an alternative, albeit a severe one, with which it might satisfy the Court's concern for judicial economy. The excess insurers could agree to be bound by the conduct of the case by the remaining defendants and to abide by the law of the case in every respect as it is composed. In this fashion, an excess insurer could be dismissed and avoid the legal expenses associated with the defense of this action. In the event that an excess insurer was later brought back into this action, there would be no need to relitigate matters resolved in its absence. If the excess insurers are truly as certain as they claim to be that their levels of coverage will never be implicated, this prospect should not be unattractive, as they would have nothing to lose.

In the absence of such an agreement, however, the Court finds that the need for a comprehensive and economical resolution of this dispute, and the reasonable likelihood that at least some of the excess coverage will be implicated, create a substantial controversy between the parties of sufficient magnitude and immediacy to warrant their continued presence in this declaratory judgment action. The facts are sufficiently developed to allow the Court to render a declaratory judgment which will end the controversy among the parties without constructing a purely hypothetical dispute. The coverage issues raised in this litigation are common, indeed identical, because of the identity of relevant language among most if not all of the policies at issue. The systemic goal of comprehensive resolution of a major interpretive dispute requires that all of HCC's coverage claims be addressed in one action rather than *seriatim* as HCC's liability escalates. The issues

---

11. For example, defendants point out that regardless of the theory of trigger of coverage, a claim arising from a plumbing system installed in 1978 which fails in 1982 could never be attributed to the same policy year as a claim arising from a system installed in 1985 which fails in 1987.

between HCC and the moving defendants are ripe for adjudication.

The motions to dismiss for lack of justiciability are **DENIED.**

### ORDER

Now this 17th day of June, 1992, for the reasons set forth in the Court's Opinion of this date, defendants' motions to dismiss for lack of justiciability are **DENIED.**

**IT IS SO ORDERED.**