# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BENEFYTT TECHNOLOGIES, INC. (F/K/A HEALTH INSURANCE INNOVATIONS, INC.) | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N21C-02-143 PRW |
| | ) | CCLD |
| CAPITOL SPECIALTY INSURANCE CORPORATION, MAXUM INDEMNITY COMPANY, CERTAIN UNDERWRITERS AT LLOY 'S' OF LONDON, and ARGONAUT INSURANCE COMPANY, | ) ) ) ) ) ) ) | |
| Defendants/Counter Plaintiffs, | ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| XL SPECIALTY INSURANCE COMPANY, EXECUTIVE RISK INDEMNITY, INC., and ENDURANCE ASSURANCE CORPORATION, | ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: December 3, 2021
Decided: January 3, 2022

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Defendant Executive Risk Indemnity, Inc.'s Motion to Dismiss the Second Amended Complaint,*
**GRANTED IN PART, DENIED IN PART**

Jennifer C. Wasson, Esq., Carla Jones, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Counsel for Plaintiff Benefytt Technologies, Inc.*

Robert J. Katzenstein, Esq., SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Counsel for Defendants Maxum Indemnity Company, XL Specialty Insurance Company, and Executive Risk Indemnity, Inc.*

Patricia A Winston, Esq., MORRIS JAMES LLP, Wilmington, Delaware, *Counsel for Defendant Endurance Assurance Corporation.*

Timothy Jay Houseal, Esq., Jennifer M. Kinkus, Esq., YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware, *Counsel for Defendants Certain Underwriters at Lloyd's of London.*

John C. Phillips, Jr., Esq., David Bilson, Esq., PHILLIPS MCLAUGHLIN & HALL, P.A., Wilmington, Delaware, *Counsel for Defendant Argonaut Insurance Company.*

Joanna J. Cline, Esq., Emily L. Wheatley, Esq., TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware, *Counsel for Defendant Capitol Specialty Insurance Corporation.*

**WALLACE, J.**

This is an insurance coverage dispute. Plaintiff Benefytt Technologies, Inc. had two towers of directors and officers liability ("D&O") insurance: one for the 2017–2018 policy period, and another for 2018–2019. Benefytt has faced a series of lawsuits that implicated this insurance coverage. But Benefytt's insurers have attempted to limit their coverage obligations by sundry means; those means include disputing the policy period to which certain claims should be assigned. So Benefytt filed this action to determine its coverage rights once and for all. The parties have taken a variety of positions on how the dispute should be resolved, with few agreeing on anything.

A notable exception is Defendant Executive Risk Indemnity, Inc. Benefytt and Executive Risk agree on how Benefytt's claims should be allocated between the 2017–2018 and 2018–2019 policy periods. And if this litigation establishes that their position is the correct one, then Executive Risk will owe Benefytt nothing. This has left Executive Risk wondering why Benefytt named it as a defendant. In Executive Risk's view, there is no controversy between them. The only way that Executive Risk's coverage obligations might be triggered is if Benefytt were to fail in obtaining its desired resolution.

Consequently, Executive Risk has moved to dismiss under Civil Rules 12(b)(6) and Rule 12(b)(1). According to Executive Risk, Benefytt has failed to allege that an actual controversy currently exists between them and any dispute that

may eventually arise between them is not yet ripe for adjudication. Not so.

Benefytt and Executive Risk are aligned in the coverage dispute—for now. If Benefytt succeeds in this litigation, their alignment will continue. But if not, Executive Risk's coverage obligations to Benefytt will be triggered. Benefytt has no assurance that Executive Risk will honor its obligations without further dispute, and Executive Risk has expressly refused to give any such assurance. The Court is satisfied, therefore, that there is an actual controversy between Executive Risk and Benefytt. And because it is reasonably conceivable that Executive Risk's obligations could be triggered, the controversy is ripe for adjudication. Accordingly, Executive Risk's motion is **DENIED** with respect to Benefytt's declaratory judgment claims. But the motion is **GRANTED** with respect to Benefytt's alternative claim for breach of contract because Benefytt has not pleaded that Executive Risk breached any present coverage obligations.

## I. FACTUAL BACKGROUND

### A. THE PARTIES

Benefytt is a Delaware corporation that operates its health insurance technology business principally in Tampa, Florida.[1] Defendants are seven insurance companies from whom Benefytt purchased policies with 2017–2018 and 2018–2019

---

[1] Second Am. Compl. at ¶ 35 (D.I. 114).

policy periods. They are Capitol Specialty Insurance Corporation ("CapSpecialty"), Maxum Indemnity Company ("Maxum"), Certain Underwriters at Lloyd's of London ("Lloyd's"), XL Specialty Insurance Company ("XL"), Executive Risk, Argonaut Insurance Company ("Argonaut"), and Endurance Assurance Corporation ("Endurance").[2]

The movant-insurer, Executive Risk, provided second-layer excess D&O insurance coverage to Benefytt during the 2017–2018 policy period.[3]

## B. BENEFYTT'S INSURANCE POLICIES

At the relevant times, Benefytt had two separate lines of liability insurance.[4] One was for "Insurance Agents and Brokers Professional Liability" ("E&O insurance"). The other was for "Directors, Officers, and Company Liability" ("D&O insurance").[5] Only Benefytt's D&O policies are relevant to the pending motion.

During the 2018–2019 policy period, Lloyd's was the primary D&O insurer, with a limit of $10 million.[6] During the same period, XL was the first-layer excess insurer, Argonaut was the second-layer excess insurer, and Endurance was the third-

---

[2]  *Id.* at ¶¶ 36–42.

[3]  *Id.* at ¶ 52.

[4]  *Id.* at ¶ 32.

[5]  *Id.*

[6]  *Id.* at ¶ 55.

layer excess insurer.[7]  Each D&O excess policy had a limit of $5 million.[8]  Each D&O policy during this period ran from June 8, 2018, to June 8, 2019.[9]

The D&O insurance scheme for the 2017–2018 policy was largely the same.[10] The only two differences are that the policy period ran from May 8, 2017, to May 8, 2018,[11] and that Executive Risk was the second-layer excess insurer instead of Argonaut.[12]  Executive Risk's policy limit was also $5 million.[13]

## C. THE COVERAGE DISPUTES

The coverage disputes spawning this litigation relate to several lawsuits filed against Benefytt that are summarized here only to the extent relevant to Executive Risk's motion.

First, the Belin Claim is a consumer class action lawsuit filed against Benefytt and its former CEO in June 2019.[14]  Second, the Keippel Claim is a securities class

---

[7]  *Id.* at ¶¶ 57–59.

[8]  *Id.*

[9]  *Id.* at ¶¶ 55–59.

[10]  *See id.* at ¶¶ 50–54.

[11]  *See id.*

[12]  *Id.* at ¶ 52.

[13]  *Id.*

[14]  *Id.* at ¶¶ 66–67.

action filed against Benefytt in February 2019.[15]  Finally, three securities class actions and shareholder derivative actions were filed against Benefytt in 2017 and 2018 (the "2017–2018 Actions").[16]

Benefytt sought coverage for both the Belin Claim and the Keippel Claim under its 2018–2019 policies.  But Lloyd's, Argonaut, and Endurance each either expressly denied coverage for the Belin Claim or otherwise failed to acknowledge any coverage obligations.[17]  And although Lloyd's and XL initially agreed to fund the defense and settlement of the Keippel Claim up to the limits of their respective 2018–2019 policies, they reserved the right later to seek recoupment from Benefytt.[18]  The settlement and defense costs for the Keippel Claim exhausted Lloyd's and XL's underlying limits.[19]

The coverage disputes that have emerged relate, in part, to the policy period under which the Keippel Claim is made and whether the Keippel Claim is related to the Belin Claim.[20]  Lloyd's and XL now take the position that the Keippel Claim and

---

[15]  *Id.* at ¶ 87.

[16]  *Id.* at ¶ 14.

[17]  *Id.* at ¶¶ 76–78.

[18]  *Id.* at ¶¶ 89–90.

[19]  *Id.* at ¶ 23.

[20]  *Id.* at ¶ 14.

Belin Claim are related, and as such, they constitute a single claim.[21] From there, Lloyd's and XL diverge. XL contends the Keippel Claim was first made in the 2018–2019 policy period,[22] as does Endurance.[23] Conversely, Lloyd's and Argonaut contend the Keippel Claim is related to the 2017–2018 Actions, such that they constitute a single claim under the 2017–2018 policy period.[24] Finally, Benefytt and Executive Risk believe the Keippel Claim falls under the 2018–2019 policy period and the Keippel Claim is not related to the 2017–2018 Actions.[25]

### D. THIS LITIGATION

Benefytt filed its first complaint here in February 2021.[26] Benefytt didn't name Lloyd's, Executive Risk, or XL as defendants because it believed Lloyd's would keep its payment of the Keippel Claim under the 2018–2019 policy period.[27] Benefytt filed its First Amended Complaint a month later, after Lloyd's signaled it

---

[21]  *Id.* at ¶ 87.

[22]  *Id.* at ¶ 91.

[23]  *Id.* at ¶ 117.

[24]  *Id.* at ¶¶ 115–16.

[25]  *Id.* at ¶¶ 19, 117.

[26]  D.I. 1.

[27]  Benefytt's Br. in Opp'n to Mot. to Dismiss at 9 (D.I. 69).

intended to litigate the policy-period issue.[28]  The First Amended Complaint added

Lloyd's, Executive Risk, and XL as defendants.[29]

Executive Risk moved to dismiss the First Amended Complaint as to itself in

May 2021.[30]  At a hearing thereafter, a question arose as to whether Benefytt could

address Executive Risk's arguments by amending the First Amended Complaint to

assert claims in the alternative.  So the Court set a schedule for Benefytt to file a

Second Amended Complaint, for Benefytt and Executive Risk to supplement their

briefing, and for the other parties to file responses as they deemed appropriate.[31]

Executive Risk renewed its arguments for dismissal of the Second Amended

Complaint through its supplemental briefing.[32]

The Second Amended Complaint sets out six causes of action.  Count I is a

declaratory judgment claim against all Defendants.  Among other things, Count I

requests a declaration that: (1) the Belin Claim is a claim first made in the 2018–

2019 period; (2) Argonaut and Endurance must provide insurance coverage up to

---

[28]  *Id.*; *see also* Lloyd's Countercl. at ¶¶ 72–73, 81, 86, 92 (counterclaims alleging the Keippel Claim was first made under the 2017–2018 policy period) (D.I. 60); Argonaut's Countercl. at ¶ 96 (D.I. 48) (same).

[29]  *Id.*

[30]  D.I. 54.

[31]  D.I. 113.

[32]  D.I. 118.

their respective policy limits for the Belin Claim; (3) the Keippel Claim was first made in the 2018–2019 policy period and is not related to the 2017–2018 Actions, and Lloyd's may not seek reimbursement from Benefytt for amounts Lloyd's paid under its 2018–2019 policy for the Keippel Claim; and (4) Argonaut must cover the outstanding defense costs incurred for the Keippel Claim.[33] The only reference to Executive Risk in Count I is to note it agrees with Benefytt's position that the Keippel Claim was first made under the 2018–2019 policy period and is not related to the 2017–2018 Actions.[34]

Count IV is an alternative claim for declaratory judgment against the D&O insurers concerning the Keippel Claim. Count IV requests a declaration that: (1) the Keippel claim was first made in the 2018–2019 policy period and is not related to the 2017–2018 Actions, and Lloyd's may not seek reimbursement from Benefytt for amounts Lloyd's paid under its 2018–2019 policy for the Keippel Claim; and (2) "if not, then Lloyd's, XL, Executive Risk and Endurance must pay the Keippel Claim in full under the 2017–2018 policy period."[35] In other words, Count IV seeks to ensure coverage for the Keippel Claim in the event that Lloyd's succeeds in establishing that the claim falls under the 2017–2018 policy period.

---

[33] Second Am. Compl. at ¶ 122.

[34] *Id.* at ¶ 117.

[35] *Id.* at ¶ 149.

Count V is a corresponding breach-of-contract claim. Through it, Benefytt charges that if the Keippel Claim falls under the 2017–2018 policy period, then Lloyd's, XL, Executive Risk, and Endurance will have breached their coverage obligations by failing to promptly pay the claim under their 2017–2018 policies.[36]

Finally, Counts II, III, and VI in no way implicate Executive Risk and so need not be further addressed now.

## II. THE PARTIES' CONTENTIONS

### A. EXECUTIVE RISK'S MOTION TO DISMISS

Executive Risk moves to dismiss the Second Amended Complaint as to itself for failure to state a claim under Rule 12(b)(6) and for lack of ripeness under Rule 12(b)(1). The crux of Executive Risk's argument is that Benefytt agrees with Executive Risk's position in the coverage dispute.[37] In other words, Benefytt and Executive Risk agree that the Keippel Claim should be deemed first made in the 2018–2019 policy period.[38] And so, says Executive Risk, dismissal of any declaratory judgment count as to itself is due under Rule 12(b)(6).

Declaratory relief requires an actual controversy between the parties, but

---

[36] *Id.* at ¶ 154.

[37] *See* Executive Risk's Mot. to Dismiss at 10; Executive Risk's Suppl. Br. at 1.

[38] *See* Executive Risk's Suppl. Br. at 1.

Executive Risk sees none between itself and Benefytt.[39] Instead, Executive Risk argues any interest it may have in this dispute is "aligned with Benefytt in *support* of Benefytt's claim."[40] Therefore, Executive Risk argues, Benefytt has failed to state a claim for declaratory judgment.

Additionally, Executive Risk argues for dismissal under Rule 12(b)(1) for lack of ripeness. A dispute is not ripe where the claim is based on "uncertain and contingent events" or where "future events may obviate the need" for judicial intervention.[41] Here, Executive Risk argues any dispute between itself and Benefytt is based on "uncertain and contingent events that may not occur;"[42] specifically, a finding that the Keippel Claim falls under the 2017–2018 policy period.

Finally, Executive Risk argues Benefytt cannot salvage its declaratory judgment claim by recasting it as a breach-of-contract claim. Executive Risk points out that Benfeytt's breach-of-contract claim "exists only if Benefytt fails to succeed on its main claims against the 2018–2019 D&O Insurers."[43] But because Benefytt "does not allege any existing obligation by Executive Risk to pay any money toward

---

[39] *See id.* at 5 (collecting cases).

[40] *Id.* at 5 (emphasis in original).

[41] *See id.* at 8 (collecting cases).

[42] *Id.*

[43] *Id.* at 7–8.

the Keippel Claim," it "cannot allege any breach."[44]

## B. BENEFYTT'S OPPOSITION

Benefytt insists its interests and Executive Risk's are both real and adverse. Benefytt "seeks insurance protection from Executive Risk for the Keippel Claim, and Executive Risk disclaims any obligation to pay."[45] And, Benefytt says, Executive Risk simply accords too much weight on the fact that they, for now, share the same positions in the coverage dispute. According to Benefytt, its primary interest is "securing coverage for the Keippel Claim," and "not which insurance tower 'wins' the legal dispute over Keippel Claim placement."[46] And if the Keippel Claim were to be assigned to the 2017–2018 policy period through this litigation, Benefytt has no assurance that "Executive Risk will honor any payment obligations immediately or without further dispute, given the contentious nature of the policy placement issue."[47]

Benefytt also insists that the dispute is ripe. If Lloyd's succeeds in switching its payment of the Keippel Claim to the 2017–2018 policy period, then "Executive

---

[44]   *Id.* at 8.

[45]   Benefytt's Suppl. Br. at 3 (D.I. 125).

[46]   *Id.* at 5.

[47]   Benefytt's Answering Br. at 15 (D.I. 69).

Risk's full excess limits" will be implicated.[48] "As such, this contested coverage issue is ripe for judicial resolution, and the Court's rulings will have a direct bearing on Executive Risk's rights and obligations."[49] Benefytt's original answering brief added that controlling Delaware case law confirms the dispute is ripe for adjudication.[50]

Finally, Benefytt refutes Executive Risk's suggestion that it has not adequately alleged an actionable breach of contract. Benefytt repeats that it requested Executive Risk to fund the Keippel Claim settlement and that Executive Risk refused.[51]

## III. APPLICABLE LEGAL STANDARDS

### A. RULE 12 AND CHALLENGING SUBJECT MATTER JURISDICTION

Whenever it appears by suggestion of the parties or otherwise that the Court lacks subject matter jurisdiction over a claim, the Court must dismiss that claim.[52]

---

[48] Benefytt's Suppl. Br. at 8.

[49] *Id.* at 9.

[50] *See* Benefytt's Answering Br. at 20–22 (citing *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1238 (Del. Ch. 1987)).

[51] See Benefytt's Suppl. Br. at 3–4.

[52] Del. Super. Ct. Civ. R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action."); *see Lima USA, Inc. v. Mahfouz*, 2021 WL 5774394, at *6 (Del. Super. Ct. Aug. 31, 2021) (citing *Webster v. Brosman*, 2019 WL 5579489, at *1 (Del. Super. Ct. Oct. 29, 2019) ("Superior Court Rule of Civil Procedure 12(h)(3) mandates the Court to dismiss a claim if it appears from

In considering a jurisdictional challenge, the Court "need not accept [the movant's] factual allegations as true and is free to consider facts not alleged in the complaint."[53] Accordingly, where the movant "need only show that the Court lacks jurisdiction,"[54] the non-movant bears the "far more demanding" burden of "prov[ing]" the Court's jurisdiction exists.[55] A motion to dismiss challenging jurisdiction of the subject matter based on a lack of ripeness is properly considered under Rule 12(b)(1).[56]

## B. RULE 12(B)(6) MOTIONS FOR FAILURE TO STATE A CLAIM

A party might move to dismiss under this Court's Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[57] In resolving a Rule 12(b)(6) motion, the Court (1) accepts as true all well-pleaded factual allegations in the complaint; (2) credits vague allegations if they give the opposing party notice of the claim; (3) draws all reasonable factual inferences in favor of the non-movant;

---

the record that the Court does not have jurisdiction over the claim.")); *see generally* Del. Super. Ct. Civ. R. 12(b)(1).

[53] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (internal quotation marks omitted).

[54] *Airbase Carpet Mart, Inc. v. AYA Assocs., Inc.*, 2015 WL 9302894, at *2 (Del. Super. Ct. Dec. 15, 2015), *aff'd*, 2016 WL 4938890 (Del. Sept. 16, 2016).

[55] *Appriva*, 937 A.2d at 1284 n.14 (internal quotation marks omitted).

[56] *See Energy Transfer Equity, L.P. v. Twin City Fire Ins. Co.*, 2020 WL 5758027, *5 (Del. Super. Ct. Sept. 28, 2020); *B/E Aerospace, Inc. v. J.A. Reinhardt Holdings*, 2020 WL 4195762, at *2 (Del. Super. Ct. July 21, 2020).

[57] Del. Super. Ct. Civ. R. 12(b)(6).

and (4) denies dismissal if recovery on the claim is reasonably conceivable.[58]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[59]  Nor must the Court adopt "every strained interpretation of the allegations the plaintiff proposes."[60]  Still, even with those cautions in mind, Delaware's pleading standard is "minimal."[61]   Dismissal is inappropriate unless "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[62]   "Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss."[63]   But the Court may consider documents or exhibits outside the pleadings when they're "integral to a . . . claim and incorporated into the complaint."[64]

---

[58]   *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[59]   *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[60]   *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[61]   *Cent. Mortg.*, 27 A.3d at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895 (Del. 2002)).

[62]   *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021) (internal quotation marks omitted); *see Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility . . . .'").

[63]   *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).

[64]   *Windsor I, LLC v. CWCap. Asset Mgmt. LLC*, 238 A.3d 863, 873 (Del. 2020); *see also Malpiede*, 780 A.2d at 1083 ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

## IV. DISCUSSION

Executive Risk moves for dismissal of the Second Amended Complaint as to itself under Rules 12(b)(6) and 12(b)(1). Dismissal of the declaratory judgment claims found in Counts I and IV is not warranted. So Executive Risk's motion is **DENIED** as to them. But with respect to Count V's breach-of-contract claim, Executive Risk's motion to dismiss is **GRANTED**.

### A. DISMISSAL OF THE DECLARATORY JUDGMENT CLAIMS IS NOT WARRANTED UNDER RULE 12(b)(6).

Delaware courts are authorized to entertain an action for a declaratory judgment, provided that an "actual controversy" exists between the parties.[65] For an "actual controversy" to exist, there must be the following:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[66]

Executive Risk's argument under Rule 12(b)(6) focuses on the second and third elements. The questions, then, are: (1) Does Executive Risk have an interest in

---

[65] *See XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (citing *Stroud v. Milliken Enter., Inc.*, 552 A.2d 476, 479 (Del. 1989)).

[66] *Id.* (internal citation omitted).

contesting Benefytt's claim?; and (2) Are the interests of Executive Risk and Benefytt are real and adverse?  As to each, the answer is yes.

### 1. Executive Risk has an interest in contesting Benefytt's claims.

Executive Risk argues—albeit inconsistently—that it has no interest in contesting Benefytt's claims.[67]  Executive Risk is correct on one thing; the Second Amended Complaint doesn't "allege that Executive Risk's coverage position is incorrect."[68]  But Executive Risk is mistaken in believing this warrants dismissal. Three Delaware cases help to illustrate why:  *Hoeschst*,[69] *Philips*,[70] and *XL Specialty*.[71]

While *Hoeschst* focused primarily on the element of ripeness, it is instructive on the issues of interest and adversity as well.  There, the plaintiff-corporation faced

---

[67]  Executive Risk's opening brief highlighted "against one who has an interest in contesting the claims" as one of the "basic requirements to plead a cause of action for declaratory relief" that Benefytt fails to satisfy.  *See* Executive Risk's Opening Br. in Supp. of Mot. to Dismiss at 9–10. But at argument, Executive Risk agreed it has an interest in the Court's ruling on whether the claims fall under 2017–2018 or 2018–2019.  *See* Mot. Hr'g Tr. at 20, July 12, 2021 (D.I. 100). And then Executive Risk changed its mind again.  *See id.* at 21–22 (Q: "But you're saying that . . . it's not in Executive Risk's interest to be a part of that determination?" A: "Well, no, it's not, because Executive Risk doesn't have anything to defend.  Nobody is suing Executive Risk for Executive Risk taking the wrong position.").

[68]  Executive Risk's Opening Br. in Supp. of Mot. to Dismiss at 13.

[69]  *Hoeschst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133 (Del. Super. Ct. 1992).

[70]  *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, 565 A.2d 956 (Del. Super. Ct. 1989).

[71]  *XL Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1221–22 (Del. 2014).

significant exposure through numerous products liabilities claims.  Accordingly, it sought a judgment determining its rights and the duties of its primary, umbrella, and excess liability insurers.  Several excess insurance companies argued the insurance claims were not justiciable because there was too much uncertainty as to whether their excess coverage obligations might ever be triggered.  This Court rejected those arguments, explaining that the plaintiff "demonstrated sufficient likelihood that at least some of the higher level excess coverage might be implicated."[72]  The Court acknowledged it could not precisely determine which excess insurers were implicated and which were not.  "Such demarcation being impracticable, the principles of judicial economy and comprehensive, final resolution require[d] that all of the excess insurers potentially implicated remain in this action."[73]

A similar situation had been addressed a few years earlier by this Court in *Philips*.  There, the plaintiff-corporation faced substantial liability from suits challenging its environmental practices.  So, it filed a declaratory judgment action against its many insurance providers to determine its coverage rights. Certain excess insurers sought dismissal of the claims against them insisting that the possibility of their policies being triggered was just too remote.[74]  Not so, said the Court:  the

---

[72]  *Hoeschst*, 623 A.2d at 1140.

[73]  *Id.*

[74]  *N. Am. Philips Corp.*, 565 A.2d at 958.

plaintiff's then-present and future liabilities were sufficient to establish a reasonable likelihood that at least some of the excess policies would be triggered.[75]  Like in *Hoescht*, the Court emphasized the need to "afford a prompt resolution of [the] matter for the plaintiff to avoid delayed, sporadic and costly litigation."[76]

In *XL Specialty*, the Supreme Court of Delaware described *Hoeschst* and *Philips* as cases in which this Court "concluded that it would be difficult to distinguish between those excess policies that would be triggered and those that would not.  In those cases, therefore, the most efficient use of judicial resources was to resolve all claims as to all excess insurers simultaneously."[77]  The Court distinguished those cases from the case then before it, where the plaintiff had not alleged facts from which one could reasonably infer that "*any*" of the policies were likely to be triggered.[78]

The relationship between Benefytt and Executive Risk is similar to that of the plaintiff and the excess insurers in *Hoeschst*.  Like Executive Risk, the defendants in *Hoeschst* had "no present obligation to pay benefits under the policies"[79] and it

---

[75]  *Id.*

[76]  *Id.*

[77]  *XL Specialty Ins. Co.*, 93 A.3d at 1221–22.

[78]  *Id.* at 1222 (emphasis in original).

[79]  *Id.* at 1138.

wasn't certain whether that would change. But that uncertainty didn't mean the *Hoeschst* defendants had no interest in the coverage dispute, nor did it warrant dismissal of the claims against them. Just so here.

Executive Risk doesn't owe anything to Benefytt—yet. But that might change depending on how this litigation resolves the dispute about the Keippel Claim. Maybe Executive Risk will ultimately owe Benefytt nothing. Or maybe Executive Risk will owe Benefytt the full limits of its 2017–2018 D&O policy. Right now, that is uncertain. But either way, Benefytt has a legitimate interest in binding all potentially interested and at-risk insurers to the judgment—including Executive Risk.

When arguing otherwise, Executive Risk overstates Benefytt's agreement with its coverage position. It matters not whether Benefytt subjectively agrees or disagrees with the opinions of its insurers. Rather, this litigation is brought to determine how the Keippel Claims affects Benefytt's rights under all its insurance policies and the obligations of all its insurers for the two policy periods in question. Executive Risk has a clear interest in this determination regardless of whether it currently agrees with Benefytt's position.[80]

---

[80] As Benefytt summarized well at argument:

> Our issue here is that we keep hearing Executive Risk saying we haven't asserted anything against them that they've done wrong. And that is not the declaration we are seeking at this stage, we're not claiming a breach of contract against them, nor do we have to under the D.J. Act. What we are

Executive Risk's positions at argument remove any doubt as to its interest. The Court inquired more than once whether Executive Risk would dispute its liability to Benefytt if the Keippel Claim were assigned to the 2017–2018 policy period.[81] Executive Risk's response:

> Well, that all depends. That all depends on what the findings were, what the Executive Risk policy says, what [Benefytt] decides to do, and probably a host of other factors that we just don't know. So it is all just guesswork at this point as to what's ultimately going to occur.[82]

In other words, maybe Executive Risk will bring a separate action to determine its liability—or force Benefytt to later do so—and maybe not. That will depend on many things, most principally the outcome of this litigation. That is sufficient for a determination that Executive Risk now has the type of interest necessary for Benefytt to maintain a declaratory judgment claim against it.

---

saying is that they absolutely have an interest in the determination [the Court] will be making as to whether or not the Keippel Claim goes in their tower and triggers $5 million in follow-form excess D&O coverage, or it goes into the year two tower where certainly both sides have asserted it most properly belongs.

Mot. Hr'g Tr. at 25.

[81]  *See id.* at 5, 6, 20, and 21.

[82]  *Id.* at 6. Executive Risk's response was equally noncommittal each time the Court asked. *See id.* at 5, 20, and 21.

## 2. Executive Risk's interests are real and adverse to Benefytt's.

Executive Risk's main argument under Rule 12(b)(6) is that "a controversy does not exist between Benefytt and Executive Risk" because they agree the Keippel Claim falls under the 2018–2019 policy period.[83] But as mentioned before, Executive Risk makes no promises on whether that agreement will survive into the future. And as seen at oral argument, Executive Risk tried to leave the door open for a future action against Benefytt if the current action triggers its liability. No doubt, the interests of Benefytt and Executive Risk when it comes to this declaratory judgment action are real and adverse. And so, Executive Risk's motion to dismiss under Rule 12(b)(6) is **DENIED** with respect to Benefytt's declaratory judgment claims.

### B. DISMISSAL OF THE DECLARATORY JUDGMENT CLAIMS IS NOT WARRANTED UNDER RULE 12(b)(1).

For there to be an "actual controversy" the controverted issue involved must be ripe for judicial determination.[84] A ripeness determination requires a "common sense assessment" of whether the interests of the party seeking relief outweigh the concerns of the Court in postponing review until the question arises in some more

---

[83] *See* Executive Risk's Opening Br. in Supp. of Mot. to Dismiss at 12–13.

[84] *See XL Specialty Ins. Co.*, 93 A.3d at 1217 (citing *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del.1989)).

concrete and final form.[85]   Generally, a dispute will be deemed ripe if "litigation sooner or later appears to be unavoidable and where the material facts are static."[86] Conversely, a dispute will be deemed not ripe where the claim is based on "uncertain and contingent events" that may not occur, or where "future events may obviate the need" for judicial intervention.[87]   In the insurance coverage context, the plaintiff must establish a "reasonable likelihood" that coverage under the disputed policies will be triggered.[88]   "[A]bsolute proof that an excess insurer's policies will be triggered is by no means required . . . [but] it would be a waste of judicial resources and an unnecessary expense to the parties to force excess insurers to defend a coverage action when their coverage is unlikely to ever be implicated."[89]

Executive Risk's ripeness argument reiterates that Benefytt agrees with Executive Risk's position.  Executive Risk takes this to mean that Benefytt is not claiming that Executive Risk's policy is potentially triggered, but rather the opposite.[90]  Now, Executive Risk acknowledges that its coverage could be triggered

---

[85]   *See id.* (internal quotations and citations omitted).

[86]   *Id.* (internal quotations and citations omitted).

[87]   *Id.* at 1217–18 (internal quotations and citations omitted).

[88]   *Id.* (citing *Hoeschst*, 623 A.2d at 1137).

[89]   *Hoeschst*, 623 A.2d at 1137 (internal citations omitted).

[90]   Executive Risk's Opening Br. in Supp. of Mot. to Dismiss at 14.

if Benefytt fails in certain ways in this litigation. But, in Executive Risk's view, that outcome is too uncertain and contingent to create a ripe controversy between it and Benefytt. Not so.

**1. It is reasonably likely that coverage under Executive Risk's policy could be triggered.**

The Court must determine whether Benefytt has established a reasonable likelihood that Executive Risk's policy could be triggered. As Executive Risk acknowledged, this question turns on the policy period to which the Keippel Claim is assigned. If it is assigned to 2018–2019, Executive Risk will be off the hook. But if it is assigned to 2017–2018, Executive Risk could be "duty-bound to cover the Keippel Claim, thereby exhausting its $5 million in insurance coverage limits."[91] The question, then, is whether the latter outcome is at least reasonably likely. At this point in the life of this action, the Court must say it is.

It appears certain that one of the second-layer excess insurers will have its policy triggered—whether that be Executive Risk, if the Keippel Claim is assigned to 2017–2018, or Argonaut, if 2018–2019. The only question is which. So there is just one contingent event that must occur for Executive Risk's policy to trigger— that's a ruling in this action that the Keippel Claim fell within 2017–2018. These facts align with those of *Hoeschst* and *Philips*, where this Court "concluded that it

---

[91]    Benefytt's Br. in Opp'n to Mot. to Dismiss at 11.

would be difficult to distinguish between those excess policies that would be triggered and those that would not. In those cases, therefore, the most efficient use of judicial resources was to resolve all claims as to all excess insurers simultaneously."[92] And these facts also distinguish the current dispute from *XL Specialty*, where the plaintiff failed to allege facts from which one could reasonably conclude that "*any*" of the policies would likely be triggered.[93]

Consequently, Benefytt has established a reasonable likelihood that Executive Risk's policy could be triggered. The dispute on this point between Benefytt and Executive Risk is ripe for adjudication.

## 2. The *Schick* Factors Confirm That the Dispute is Ripe.

"A ripeness determination requires an assessment of whether the interest of the party seeking immediate relief outweighs the concerns of a party 'in postponing review until the question arises in some more concrete and final form.'"[94] This analysis is guided by the *Schick* factors:

> (1) a practical evaluation of the plaintiff's legitimate interest in prompt resolution of the question presented, (2) the hardship that further delay may threaten, (3) the possibility of future factual development that might affect the determination made, (4) the

---

[92] *See XL Specialty*, 93 A.3d at 1221–22 (citing *Hoechst*, 623 A.2d at 1140 and *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, 565 A.2d 956, 962 (Del. Super. Ct. 1989)).

[93] *See id.* at 1222 (emphasis in original).

[94] *Dewey Beach Enter., Inc. v. Drass Ins. Agency*, 2021 WL 1930513, at *1 (Del. Super. Ct. May 13, 2021) (quoting *Stroud v. Milliken Enter., Inc.*, 552 A.2d 476, 480 (Del. 1989)).

need to conserve scarce judicial resources, and (5) a due respect for identifiable policies of the law touching upon the subject matter dispute.[95]

Here, the *Schick* factors confirm that Executive Risk's obligations are ripe for determination. First, Benefytt has a legitimate interest in the prompt resolution of its coverage dispute with respect to all its insurers, including Executive Risk. The possibility that Executive Risk may dispute its liability in the future—which Executive Risk refuses to rule out[96]—confirms the legitimacy of Benefytt's interest in a resolution of its coverage rights here and now.

Second, delay may threaten hardship for Benefytt in the form of piecemeal litigation. If Executive Risk were dismissed, Benefytt would face the risk of litigating the current dispute, losing, and then facing a second dispute with Executive Risk. "The burden on a party to re-litigate issues is a well-recognized 'obvious prejudice.'"[97] Too, piecemeal litigation is contrary to judicial economy and the need to conserve the Court's resources recognized in the fourth *Schick* factor.[98] These

---

[95] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987).

[96] *See* Mot. Hr'g Tr. at 5, 6, 20, and 21.

[97] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *16 (Del. Super. Ct. Jan. 31, 2019) (quoting *Mine Safety Appliances Co. v. AIU Ins. Co.*, 2014 WL 605753, at *5 (Del. Super. Ct. Jan. 21, 2014)).

[98] *Id.*

factors weigh heavily in favor of denying dismissal. Benefytt's insurers are all parties to this case. Executive Risk is the only one that has moved to excuse itself. It is in the best interests of the parties and the Court that Executive Risk remain so that a single resolution can be reached without risk of later litigation and the attendant potential for inconsistent results.

As to the third *Schick* factor, there is no need to wait for additional facts to develop with respect to Executive Risk. The sole condition affecting Executive Risk's liability is whether the Keippel Claim is assigned to 2017–2018 or 2018–2019—a key issue to be resolved in this litigation.

Finally, denying dismissal on the present motion is consistent with the "policies of the law touching upon the subject matter of the dispute."[99] Benefytt is seeking a declaratory judgment on its insurance coverage rights. This Court has long observed that "[t]he question of liability under insurance contracts has proved to be particularly susceptible to declaratory adjudication."[100]

Under these circumstances, the issue of Executive Risk's coverage obligations is now ripe for adjudication and declaration. Executive Risk's Motion to Dismiss under Rule 12(b)(1) is, therefore, **DENIED**.

---

[99] *Schick*, 533 A.2d at 1239.

[100] *See Harleysville Mut. Cas. Ins. Co. v. Carroll*, 123 A.2d 128 (Del. Super. Ct. 1956).

## C. BENEFYTT'S BREACH-OF-CONTRACT CLAIM FAILS TO STATE A CLAIM AGAINST EXECUTIVE RISK.

Count V alleges that if the Keippel Claim falls under the 2017–2018 policy period, then Lloyd's, XL, Executive Risk, and Endurance will have breached their coverage obligations by failing to promptly pay the claim under their 2017–2018 policies.[101] Executive Risk correctly posits that this claim fails to adequately allege that it breached any contractual obligations. The Second Amended Complaint makes clear that Benefytt seeks coverage for the Keippel Claim under its 2018–2019 D&O policies.[102] But Executive Risk provided D&O insurance only for 2017–2018. Therefore, Executive Risk has no present obligation to cover the Keippel Claim that it could have breached.

Benefytt claims it requested that Executive Risk fund the Keippel Settlement since the fall of 2020, and that Executive Risk refused.[103] Furthermore, Benefytt complains that "Executive Risk was fully aware that if the Keippel Claim was a Claim under the 2017–2018 policy period, then . . . its D&O was triggered with respect to the Keippel Claim."[104] But the fact remains that if the Keippel Claim is a

---

[101]    Second Am. Compl. at ¶ 154.

[102]    *Id.* at ¶ 19.

[103]    Executive Risk's Suppl. Br. at 3 (citing Second Am. Compl. at ¶¶ 97–105).

[104]    Second Am. Compl. at ¶ 102.

claim under the 2018–2019 policy period, as Benefytt currently claims it to be, then Executive Risk had and has no coverage obligations whatsoever. It simply cannot be said that Executive Risk could retroactively breach its obligations by refusing to cover a claim that, at the time, Benefytt itself said it had no obligation to cover. Accordingly, Executive Risk's motion is **GRANTED** with respect to Count V of the Second Amended Complaint.

## D. EXECUTIVE RISK MAY EXIT THIS LITIGATION IF IT AGREES TO BE BOUND BY ITS DETERMINATIONS.

In *Hoeschst*, this Court explained that an excess insurance company may have another option if it does not wish to participate in a coverage dispute:

> An excess insurer who seeks dismissal has an alternative, albeit a severe one, with which it might satisfy the Court's concern for judicial economy. **The excess insurers could agree to be bound by the conduct of the case by the remaining defendants and to abide by the law of the case in every respect as it is composed. In this fashion, an excess insurer could be dismissed and avoid the legal expenses associated with the defense of this action.** In the event that an excess insurer was later brought back into this action, there would be no need to relitigate matters resolved in its absence. If the excess insurers are truly as certain as they claim to be that their levels of coverage will never be implicated, this prospect should not be unattractive, as they would have nothing to lose.[105]

Executive Risk is free to exercise this option if it so chooses. But in the absence of such an agreement, the Court finds that the need for a comprehensive and

---

[105]   *Hoeschst*, 623 A.2d at 1140 (emphasis added).

economical resolution of this dispute, and the reasonable likelihood that Executive Risk's policy could be implicated, create a controversy sufficient to warrant Executive Risk's continued presence in this declaratory judgment action.[106]

## V. CONCLUSION

For the foregoing reasons, Executive Risk's Motion to Dismiss is **DENIED** on the declaratory judgment claims in Counts I and IV and **GRANTED** on the breach-of-contract claim in Count V.  If, and only if, Executive Risk agrees to be bound by the Court's determinations in this case despite its absence may Executive Risk be dismissed.  That dismissal would occur only upon separate application or stipulation expressly memorializing such assent.  Otherwise, Executive Risk must remain a party to defend against its potential coverage exposure.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve

---

[106]    *See id.* at 1140–41.