# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| VT SHAREHOLDER REPRESENTATIVE, LLC, in its capacity as the Shareholders' Representative for the former Participating Holders of Valtech Cardio Ltd., <br><br> Plaintiff, <br><br> v. <br><br> EDWARDS LIFESCIENCES CORPORATION and VALTECH CARDIO LTD., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 2023-0316-MAA |

Submitted: September 28, 2023
Decided: December 12, 2023

## MEMORANDUM OPINION

*Defendants' Motion to Dismiss Plaintiff's Verified Complaint* **- GRANTED.**

C. Barr Flinn, Esquire, and Lauren Dunkle Fortunato, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, and Jeffrey B. Korn, Esquire (Argued) and Philip F. DiSanto, Esquire, of WILLKIE FARR & GALLAGHER LLP,  New York, New York, *Attorneys for Plaintiff*.

Jon E. Abramczyk, Esquire, Ryan D. Stottmann, Esquire, and Alec Hoeschel, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Michele D. Johnson, Esquire, of LATHAM & WATKINS LLP, Costa Mesa, California, and Eric F. Leon, Esquire, (Argued) and Sarah Burack, Esquire, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants*.

**Adams, J.[1]**

---

[1] Sitting as a Vice Chancellor of the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to In re Designation of Actions Filed

## I.     INTRODUCTION

This is a breach of contract action between Plaintiff VT Shareholder Representative, LLC ("VT Shareholder" or "Plaintiff") and Defendants Edwards Lifesciences Corporation ("Edwards") and Valtech Cardio Ltd. ("Valtech") (collectively "Defendants").  Plaintiff entered into an Agreement and Plan of Merger (the "Merger Agreement") wherein Edwards acquired Valtech from the former Participating Holders of Valtech.  The Merger Agreement provided for an Earn-Out Period of ten years from the closing date of January 23, 2017.

Plaintiff now seeks a declaratory judgment that Defendants have breached the Merger Agreement. Plaintiff alleged Defendants failed to use "commercially reasonable efforts" to achieve four delineated milestones in the Merger Agreement. Defendants move to dismiss, arguing: (1) the claims are not yet ripe for consideration; and (2) Plaintiff failed to state a claim for which relief can be granted. For the reasons that follow, the Court finds that Plaintiff's claims are not yet ripe for adjudication.  Therefore, the Court grants Defendants' Motion to Dismiss pursuant to Court of Chancery Rule 12(b)(1).  As such, Defendants' Motion to Dismiss pursuant to Court of Chancery Rule 12(b)(6) is moot.

---

Pursuant to In re: DESIGNATION OF THE HONORABLE MEGHAN A. ADAMS under Del. Const. art. IV § 13(2) dated March 16, 2023.

## II.   FACTS[2]

### A.   THE PARTIES

Plaintiff VT Shareholder serves as the representative for the Former Participating Holders of Valtech Cardio Ltd. (the "Sellers").[3]  Defendant Edwards develops and manufactures structural heart therapies[4] and is "self-described" as a "global leader" in innovative structural heart disease treatments.[5]  Defendant Valtech was a private company specializing in heart valve disease treatments and is now a subsidiary of Edwards.[6]  Valtech is responsible for developing the Cardioband System ("Cardioband"), which repairs mitral and tricuspid valves through a catheter.[7]

### B.   THE CARDIOBAND PRODUCT

The Cardioband product is unique for its ability to "combine direct adjustable annuloplasty (*i.e.,* tightening or reinforcing a leaky heart valve with a ring) with a transcatheter approach to the heart."[8] Cardioband provides an alternative for patients who are ineligible for open-heart surgery.[9]  The procedure can be a "life-saving"

---

[2] The facts are drawn from the Complaint and the exhibits attached thereto, which includes the Agreement and Plan of Merger (Ex. A), and Edwards' Letter of Intent (Ex. B).
[3] Compl. ¶ 15.
[4] *Id.* ¶ 1.
[5] *Id.* ¶ 7.
[6] *Id.* ¶ 1.
[7] *Id.*
[8] *Id.* ¶ 2.
[9] *Id.*

treatment for patients who have particular complications.[10] Cardioband has not yet been approved for use in the United States, but it has been sold in Europe to treat mitral regurgitation since 2015.[11] Cardioband presents a "several-billion dollar market opportunity" considering the number of patients affected by these heart issues in the United States.[12]

Cardioband has products that treat two common heart diseases: mitral regurgitation and tricuspid valve regurgitation.[13] Mitral regurgitation ("MR") "is a heart condition in which the mitral valve leaflets (small flaps of tissue) fail to close properly, allowing blood to backflow from the left ventricle (the lower chamber of the heart) into the left atrium (the upper chamber)."[14] In 2015, approximately 4.2 million Americans were affected by MR.[15] Cardioband developed an MR product ("Cardioband MR") that can treat patients who are ineligible for open-heart surgery.[16] Tricuspid regurgitation ("TR") "is a heart condition in which blood leaks from the right ventricle into the right atrium due to the tricuspid valve leaflets' failure to close properly."[17] In 2018, there were approximately 1.6 million Americans with

---

[10] Id. ¶ 3.
[11] Id.
[12] Id. ¶ 23.
[13] Id. ¶ 22.
[14] Id. ¶ 23.
[15] Id.
[16] Id. ¶ 26.
[17] Id. ¶ 30.

moderate-to-severe TR.[18] Cardioband has a similar product to Cardioband MR, ("Cardioband TR") that treats TR using a transcatheter delivery system.[19]

## C. THE MERGER

On August 1, 2016, Edwards signed a Letter of Intent "outlining the principal terms and conditions on which it would acquire Valtech and the Cardioband product line from the Sellers."[20] On November 26, 2016, the parties entered into the Agreement and Plan of Merger (the "Merger Agreement")[21] wherein Edwards acquired Valtech from the Sellers.[22] Edwards paid the Sellers $340 million up-front, and the parties agreed to an additional $350 million in potential earn-out payments (the "Earn-Out Payments").[23] Upon completion of development targets for Cardioband, Edwards and Valtech agreed to pay the Earn-Out Payments.[24] The Merger Agreement delineates four Earn-Out Payments:

> (i) a one-time payment of $50 million to the Sellers in the event Edwards or any of its subsidiaries 'receives written CE Mark for a Cardioband Product[25] for reconstruction or repair of the

---

[18] *Id.*
[19] *Id.* ¶ 32.
[20] *Id.* ¶ 34 (citing Ex. B at 1).
[21] *Id.* (citing Ex. A).
[22] *Id.* ¶ 4.
[23] *Id.*
[24] *Id.*
[25] The Merger Agreement defines "Cardioband Product" as, "collectively, (a) any transcatheter system, device or technology for reconstruction or repair of the mitral valve or tricuspid valve by direct adjustable annuloplasty, which is or is derived from the Cardioband product that received CE Marking in 2015 (the '**CE Marked Product or Derivative Product**') and (b) any transcatheter system, device or technology for reconstruction or repair of the mitral valve or the tricuspid valve by direct adjustable annuloplasty, covered by, derived from, using or that infringes or would

5

tricuspid valve by direct adjustable annuloplasty on or prior to the last day of the Earn-Out Period' (the 'CE Mark Milestone');[26]

(ii) a one-time payment of $150 million to the Sellers in the event Edwards or any of its subsidiaries 'received written FDA approval for a Cardioband Product for reconstruction or repair of the mitral valve by direct adjustable annuloplasty on or prior to the last day of the Earn-Out Period' (the 'FDA Mitral Milestone');

(iii) a one-time payment of $50 million to the Sellers in the event Edwards or any of its subsidiaries 'receives written FDA approval for a Cardioband Product for reconstruction or repair of the tricuspid valve by direct adjustable annuloplasty on or prior to the last day of the Earn-Out Period' (the 'FDA Tricuspid Milestone'); and

(iv) a one-time payment of $100 million to the Sellers in the event Edwards and its subsidiaries 'generate Net Sales during any four (4) consecutive fiscal quarters during the period beginning on the first day of the first calendar month following the calendar month including the Effective Time and ending on the last day of the Earn-Out Period, of the Cardioband Product in excess of six hundred fifty million dollars ($650,000,000) in the aggregate over such four (4) consecutive fiscal quarters' (the 'Net Sales Milestone,' collectively the 'Milestones' and each a 'Milestone').[27]

The Merger Agreement requires Edwards and Valtech to use "commercially reasonable efforts (including with respect to manner and timeframe) to . . . satisfy the conditions of and achieve each of the FDA Mitral Milestone, the FDA Tricuspid Milestone and the Net Sales Milestone (including by using commercially reasonably efforts to Commercialize the Cardioband Product in order to achieve the Net Sales

---

infringe upon, any Company Intellectual Property used in or related to the CE Marked Product or Derivative Product." Merger Agreement at A-2.

[26] This milestone is not at issue because it was already met in 2018. Compl. ¶ 4 n.2.

[27] *Id.* ¶ 38 (citing Merger Agreement § 1.11(k) & Ex. A to Merger Agreement).

6

Milestone) . . . ."[28]  The Merger Agreement outlines factors to determine if actions

are "commercially reasonable" including:

> (A) developments in the market of such Cardioband Product, (B) the expected size of the market for such Cardioband Product, (C) profit margins, (D) the level of regulatory approval that may be available for such Cardioband Product (including the extent of the indications for which such Cardioband Product may be approved), (E) the level of reimbursement that may be available for the Cardioband Product, (F) the cost and outcome of any clinical trials, (G) the safety and efficacy of the Cardioband Product, (H) the Intellectual Property protection of, and known third party infringement by, such Cardioband Product, (I) the known presence of third-party Intellectual Property that may impact the marketability of such Cardioband Product, (J) the presence or absence of particularly difficult manufacturing issues, (K) the expected competitive position of such Cardioband Product vis-à-vis other therapies that have been or are developed, marketed and sold (or that have been or are developed and that have received all required regulatory approvals necessary for the marketing and sale of such other therapies) for the same or similar indications, including with respect to the expected or actual efficacy and cost of such Cardioband Products when compared to such other products, (L) the cost of development, and (M) Parent's and its Affiliates overall portfolio of products (provided that, in no event, will any products competitive to any of the Cardioband Products that are or become part of Parent's or its Affiliates' portfolio of products be a determinative factor in such assessment) . . . .[29]

The Merger Agreement also requires Edwards and Valtech to use

"commercially reasonable efforts (including with respect to manner and timeframe)

to receive approval for and conduct the FDA trial (or such other FDA trial as Parent

determines is reasonably practicable following further discussion and investigation

---

[28] Merger Agreement § 1.11(k)(i).
[29] *Id.*

with the FDA) during the Earn-Out Period."[30]   Prior to signing the Merger Agreement, the Sellers rejected a provision that would have given Edwards "'sole and complete discretion in its determination as to when or whether to seek or achieve' the FDA mitral and tricuspid milestones."[31]  If the § 1.11(k) provisions are breached by Edwards or its subsidiaries, "the unearned Contingent Payments that are affected by such breach will become immediately due and payable regardless of whether the related Milestones have been achieved."[32]

The Merger Agreement provides a ten-year window called the "Earn-Out Period" as the "date all Contingent Payments have been paid to the Participating Holders."[33]  The Earn-Out Period concludes on the tenth anniversary of the closing date: January 23, 2027.[34]

### D.    CARDIOBAND DEVELOPMENT EFFORTS

#### 1)    Cardioband MR

In September of 2015, Valtech obtained CE Mark approval[35] for Cardioband MR which allowed for the medical device to be sold in European Union countries.[36]

---

[30] *Id.* § 1.11(k)(ii)(B).
[31] Compl. ¶ 37.
[32] Merger Agreement § 1.11(k)(v).
[33] *Id.* at A-6.
[34] *See* Compl. ¶ 48.
[35] "The *Conformite Europeenne* Mark ('CE Mark') is a European Union prerequisite for a medical device to be sold in member countries.  CE Mark indicates that a product has been assessed by the manufacturer and deemed to meet EU safety, health, and environmental protection requirements." *Id.* ¶ 27.
[36] *Id.*

Valtech proceeded with obtaining FDA approval and "projected that the FDA Trial would be ramping up by the first half of 2017."[37] The Cardioband TR had an anticipated CE Mark approval date of the second half of 2017.[38]

"The FDA Trial was originally projected to take place at up to seventy-five sites beginning in April 2017, with an anticipated 'Primary Completion' date of December 2019 and a final 'Study Completion' date of December 2023."[39] Despite the FDA Trial's study protocol desiring a pivotal cohort of 375 patients, up to a total of 600, as of March 2023, Edwards enrolled only twelve patients across twenty-four study sites.[40] Edwards also has not "actively recruited for the FDA Trial since November 2018."[41] Edwards asserted in SEC filings that patient enrollments were stalled as a result of the COVID-19 pandemic; however, publicly available information indicates that Edwards' recruitment efforts stopped a year prior to the pandemic's inception.[42] Edwards also noted in correspondence with Plaintiff that "Cardioband had deficient and undocumented supply-chain and manufacturing processes," and that Edwards had to engage with interventional cardiologists to

---

[37] *Id.* ¶¶ 28–29.
[38] *Id.* ¶ 33.
[39] *Id.* ¶ 52.
[40] *Id.* ¶¶ 51–52.
[41] *Id.* ¶ 52.
[42] *Id.* ¶ 53.

undergo a redesign of the Cardioband product.[43]  In the Complaint, Plaintiff disputed Edwards' assertions and instead pled that these deficiencies were merely pretext.[44]

On December 8, 2016, Edwards introduced PASCAL, a product similar to Cardioband, and indicated its intentions to initiate a PASCAL CE Mark study in 2017.[45]  PASCAL and Cardioband are direct competitors,[46] but when announced, PASCAL was not as developed as Cardioband.[47]  Prior to PASCAL's introduction in December 2016, Plaintiff was unaware of its existence, nor Edwards' plans to advance it.[48]  Since closing, Edwards has undergone "significant investments to develop and commercialize" PASCAL, including taking substantial steps towards obtaining FDA approval and by enrolling ten times as many patients in PASCAL's trial compared to its related Cardioband trial.[49]  Edwards obtained CE Mark approval for PASCAL MR in February 2019 and FDA approval to market PASCAL for treatment of MR on September 14, 2022.[50]  Plaintiff argues that the development and success of PASCAL proves Edwards is "well aware of the efforts it must undertake to conduct clinical trials for, obtain FDA approval of, and commercialize

---

[43] *Id.* ¶ 54.
[44] *Id.* ¶¶ 54–57.
[45] *Id.* ¶ 59.
[46] PASCAL and Cardioband are both designed to treat patients for symptomatic mitral regurgitation who are high-risk for open-heart surgery.  *Id.* ¶ 61.
[47] *Id.* ¶ 59.
[48] *Id.*
[49] *Id.* ¶¶ 62–63.
[50] *Id.* ¶¶ 65–66.

10

a transcatheter mitral valve repair system" despite Defendants' failures to do so for its Cardioband products.[51]

### 2) Cardioband TR

Edwards obtained CE Mark approval to sell Cardioband TR in April 2018.[52] Since then, Edwards has launched a post-market study for Cardioband TR, but it has not undertaken additional steps to obtain FDA approval.[53] In the same time period, Edwards obtained CE Mark approval for PASCAL TR and received approval to conduct clinical trials on PASCAL TR.[54] Edwards also devoted resources to other mitral and tricuspid systems, including by conducting trials and obtaining FDA approval for these products.[55]

### 3) Net Sales

In the past three years, Cardioband's global annual net sales ranged from approximately $2.76 million to $4.93 million, falling significantly below the net sales target in the Merger Agreement of $650 million.[56] In comparison, Edwards' total sales for all transcatheter mitral and tricuspid therapies have "increased dramatically" thanks primarily to PASCAL's developments.[57] Plaintiff requested

---

[51] *Id.* ¶ 67.
[52] *Id.* ¶ 69.
[53] *Id.* ¶ 70.
[54] *Id.* ¶ 71.
[55] *Id.* ¶ 72.
[56] *Id.* ¶¶ 74–75.
[57] *Id.* ¶ 75.

Edwards to provide information, in compliance with the Merger Agreement, detailing its efforts to improve Cardioband, but Edwards failed to adequately do so.[58] Plaintiff asserted that "Edwards acquired Cardioband to shelve it and eliminate PASCAL's main competitive threat"[59] despite such a strategy directly violating the Merger Agreement.[60]

## III.   PROCEDURAL HISTORY

On March 14, 2023, Plaintiff filed a complaint alleging four counts of breach of contract:

- Count I: Failure to Use "Commercially Reasonable Efforts" to Achieve the FDA Mitral Milestone pursuant to Section 1.11(k)(i) of the Merger Agreement;[61]

- Count II: Failure to Use "Commercially Reasonable Efforts" to Conduct the FDA Trial pursuant to Section 1.11(k)(i) of the Merger Agreement;[62]

---

[58] *Id.* ¶¶ 80–83. "As an example, for the past two years, Edwards' summary report on Cardioband's progress has stated that '[n]ext generation systems and imaging innovations are in development to meaningfully shorten procedure time and improve ease of use,' without providing any explanation of **what** those 'next generation systems' or 'imaging innovations' are, **how** they will shorten the time and ease of use or improve the commercial viability of the Cardioband product, or **why** they must be implemented before achieving the Milestones." *Id.* ¶ 80 (emphasis in original).
[59] *Id.* ¶ 8.
[60] *Id.* ¶ 10.
[61] *Id.* ¶¶ 85–94.
[62] *Id.* ¶¶ 95–103.

- Count III: Failure to Use "Commercially Reasonable Efforts" to Achieve the FDA Tricuspid Milestone pursuant to Section 1.11(k)(ii)(B) of the Merger Agreement;[63]

- Count IV: Failure to Use "Commercially Reasonable Efforts" to Achieve the Net Sales Milestone pursuant to Section 1.11(k)(i) of the Merger Agreement.[64]

On May 10, 2023, Defendants filed a Motion to Dismiss all claims arguing that: (1) the claims are not ripe for adjudication; and (2) Plaintiff failed to state a claim.[65] Briefing concluded on August 30, 2023. The Court held oral argument on September 27, 2023, and reserved decision.

## IV. STANDARD OF REVIEW

On a motion to dismiss pursuant to Court of Chancery Rule 12(b)(1), the burden is on the non-moving party to establish the Court's jurisdiction.[66] Subject matter jurisdiction requires a ripe issue which is reviewed on a case-by-case basis.[67] To determine ripeness, the Court should "view the material factual allegations of the complaint as true,"[68] and "all inferences therefrom should be construed in the non-

---

[63] *Id.* ¶¶ 104–13.
[64] *Id.* ¶¶ 114–23.
[65] Defs.' Br. in Supp. of Mot. to Dismiss at 11.
[66] *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013).
[67] *B/E Aerospace, Inc. v. J.A. Reinhardt Hldgs., LLC*, 2020 WL 4195762, at *1 (Del. Super. July 21, 2020).
[68] *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 588 (Del. 1970) (citing *DuPont v. DuPont*, 85 A.2d 724, 726 (Del. 1951)).

13

moving party's favor."[69]  The Court should dismiss the claim if "future events *may* 'obviate the need for judicial intervention.'"[70]

## V.    ANALYSIS

### A.    RIPENESS

The Declaratory Judgment Act authorizes Delaware courts to "declare rights, status and other legal relations whether or not further relief is or could be claimed."[71] The Court has discretion as to whether to grant a declaratory judgment so long as there is an "actual controversy."[72]  Despite this discretion, courts "should be especially cautious when the request for relief in a declaratory judgment raises 'novel and important [issues] to Delaware Corporate Law.'"[73]  The Supreme Court of Delaware established a four-part test for determining an "actual controversy:"

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[74]

---

[69] *de Adler*, 2013 WL 5874645, at *7 (internal citations omitted).
[70] *B/E Aerospace, Inc.*, 2020 WL 4195762, at *2 (quoting *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1218 (Del. 2014)) (emphasis in original).
[71] 10 Del. C. § 6501.
[72] *XL Specialty*, 93 A.3d at 1216 (citing *Gannett Co., v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003)).
[73] *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *11 (Del. Ch. Oct. 11, 2006) (quoting *Bebchuck v. C.A., Inc.*, 902 A.2d. 737, 740 (Del. Ch. 2006)).
[74] *Rollins Int'l Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).

If there is no "actual controversy" between the parties, then the Court must decline to issue a declaratory judgment.[75]

The Declaratory Judgment Act authorizes the court to "adjudicate a controversy prior to the time when a remedy is traditionally available and, thus, to advance the stage at which a matter is traditionally justiciable."[76] The Act is "remedial in character and [] the term 'actual controversy' should be liberally interpreted."[77] Declaratory judgments allow for "preventive justice"[78] because "legitimate legal interests are sometimes cast into doubt by the assertion of adverse claims and that, when this occurs, a party who suffers practical consequences ought not to be required to wait upon his adversary for a judicial resolution that will settle the matter."[79] Declaratory judgments allow parties to solve questions about a contract's construction or validity, clarify legal rights, and other legal matters.[80]

"[R]ipeness is a critical element of a declaratory judgment action."[81] For an issue to be "ripe for judicial determination" the court must find that the "material facts are static and that the rights of the parties are presently defined rather than

---

[75] *Stone Energy Corp.*, 2006 WL 2947483, at *6.
[76] *Rollins Int'l Inc.*, 303 A.2d at 662 (citing *Diebold Comput. Leasing, Inc.*, 267 A.2d at 591–92).
[77] *Id.*
[78] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1237–38 (Del. Ch. 1987) (quoting *Stabler v. Ramsay*, 88 A.2d 546, 557 (Del. 1952)).
[79] *Id.* (citing *Diebold Comput. Leasing, Inc.*, 267 A.2d at 591).
[80] *See Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *9 (Del. Ch. Jan. 4, 2022). *See also Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 816 (Del. 2018) (determining the effect of a town ordinance).
[81] *Shevock v. Orchard Homeowners Ass'n*, 621 A.2d 346, 348 (Del. 1993).

future or contingent."[82]   "A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form."[83]  "Plaintiffs must allege that present harms will flow from the threat of future action."[84]  The burden of establishing the court's subject matter jurisdiction is with the party seeking the court's intervention.[85]   The ripeness requirement for judicial opinions prevents courts from rendering advisory opinions or adjudication of hypotheticals.[86]  "[A] dispute will be deemed not ripe where the claim is based on uncertain and contingent events that may not occur, or where future events may obviate the need for judicial intervention."[87]

If a declaratory judgment is issued when a case is not ripe, there are "two principal dangers—squandering scarce judicial resources, and intervening in a controversy where the specific facts do not necessitate judicial intervention."[88]  To determine whether a case is ripe, courts make a practical determination of "whether the parties' conflicting contentions present a genuine and substantial controversy

---

[82] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 481 (Del. 1989) (citing *Stabler*, 88 A.2d at 550).
[83] *S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*, 2021 WL 3925937, at *5 (Del. Ch. Sept. 1, 2021) (quoting *XL Specialty*, 93 A.3d at 1217–18).
[84] *Stone Energy Corp.*, 2006 WL 2947483, at *7 (internal citations omitted).
[85] *B/E Aerospace, Inc.*, 2020 WL 4195762, at *1.
[86] *See Stone Energy Corp.*, 2006 WL 2947483, at *6 (citing *Stroud*, 552 A.2d at 480); *Rollins Int'l Inc.*, 303 A.2d at 662 (citing *Stabler*, 88 A.2d at 550).
[87] *Alexion*, 2021 WL 3925937, at *5 (quoting *XL Specialty*, 93 A.3d at 1217–18).
[88] *B/E Aerospace, Inc.*, 2020 WL 4195762, at *5 (citing *Schick Inc.*, 533 A.2d at 1239).

16

between parties having adverse legal interests."[89] This determination weighs various interests including the plaintiff's interest in a prompt response, the plaintiff's hardship upon further delay, conservation of judicial resources, and the likelihood that new facts will impact the determination.[90] Courts have found cases ripe for review when the "eventual litigation appears to be unavoidable;"[91] however, a "court cannot accelerate an embryonic matter to a stage traditionally justiciable if doing so would produce an advisory opinion along the way."[92] Facts are required to be static and concrete because if not, "it runs the risk not only of granting an incorrect judgment, but also of taking an inappropriate or premature step in the development of the law."[93]

Defendants argue that Plaintiff's allegations are not ripe for judicial review for three reasons:[94] (1) "the claims here are not 'unavoidable' or based on a 'static' set of 'material facts[;]'"[95] (2) "they are expressly 'based on uncertain and contingent events that may not occur[;]'"[96] and (3) "'future events may obviate the need' for

---

[89] *Stone Energy Corp.*, 2006 WL 2947483, at *6 (citing *Anonymous v. State*, 2000 WL 739252, at *4 (Del. Ch. June 1, 2000)).

[90] *Schick Inc.*, 533 A.2d at 1239. *See also B/E Aerospace, Inc.*, 2020 WL 4195762, at *5; *Shevock*, 621 A.2d at 348.

[91] *Rollins Int'l Inc.*, 303 A.2d at 662 (citing *Stabler*, 88 A.2d at 550).

[92] *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, at *8 (Del. Super. Sept. 23, 2021).

[93] *Stroud*, 552 A.2d at 480.

[94] All four Counts rely on related facts and therefore this Court considers them collectively. While the Milestones are distinct from each other, the underlying assessment of the facts leading up to this suit, and potentially throughout the remainder of the Earn-Out Period are related.

[95] Defs.' Br. in Supp. of Defs.' Mot. to Dismiss at 12–14 (citing *XL Specialty*, 93 A.3d at 1217).

[96] *Id.* at 14 (citing *XL Specialty*, 93 A.3d at 1217–18) (internal citations omitted).

the very 'judicial intervention' Plaintiff seeks."[97]   Plaintiff did not dispute the existence of the ten-year Earn-Out period, but instead argued its claims are ripe because Defendants have *already* breached their obligations, regardless of the ongoing performance period.[98]

> **1)** **It is Not Immediately Clear that Litigation is Probable or Imminent to Justify a Declaratory Judgment.**

*Goldenberg v. Immunomedics, Inc.*,[99] a recent decision from this Court regarding ripeness, is instructive on the issue of probable or imminent litigation.  In *Goldenberg*, an employee sought declaratory judgment based on his employment agreement.[100]  The employee argued that the company "has a history of failing to comply with its obligations[,]" thereby making the dispute ripe.[101]   The court disagreed.[102]  The employment provision was tied to a royalties provision that the

---

[97] *Id.* at 14–15 (citing *XL Specialty*, 93 A.3d at 1218).

[98] Pl.'s Opp'n to Defs.' Mot. to Dismiss at 36.

[99] *Goldenberg v. Immunomedics, Inc.*, 2021 WL 1529806 (Del. Ch. Apr. 19, 2021).

[100] *Id.* at *1.  The Court notes Plaintiff's criticism that Defendants "d[id] not cite a single earnout case in which a court concluded that claims were not ripe because the earnout period had not yet expired."  Pl.'s Opp'n to Defs.' Mot. to Dismiss at 40 n.7.  Defendants did not dispute this at oral argument but noted that it is inconsequential because "the ripeness legal standard is one that applies regardless of the factual context."  *VT S'holder Representative, LLC v. Edwards Lifesciences Corp.*, C.A. No. 2023-0316, at 35 (Del. Ch. Sept. 27, 2023) (TRANSCRIPT).  This Court agrees. Ripeness is "far more demanding of the non-movant than Rule 12(b)(6) motions to dismiss."  *B/E Aerospace, Inc.*, WL 4195762, at *1 (internal quotations omitted).  While similar earn-out cases may be instructive to this Court, such cases are not the only applicable cases that address the ripeness standard and how it must be applied.

[101] *Goldenberg*, 2021 WL 1529806, at *20.

[102] *Id.*

court noted may never generate royalties and consequently may never result in a dispute or litigation.[103]  Therefore, the issue was not ripe for judicial review.[104]

Here, Plaintiff provides examples of Defendants' past failure to proceed to required trials, and their success with PASCAL, to suggest that Defendants failed to use "commercially reasonable efforts."  As in *Goldenberg*, this past behavior is not sufficient to establish a future breach.  Even if the Court accepts as true Plaintiff's contentions that Defendants have failed to use "commercially reasonable efforts" so far, this, like *Goldenberg*, may never result in a claim if Defendants can achieve the Milestones by the end of the Earn-Out Period.

The Supreme Court of Delaware's decision in *XL Specialty Insurance Co. v. WMI Liquidating Trust*[105] also made clear that in order for a claim to be ripe, it must "assume[] a concrete or final form."[106]  In *XL Specialty*, the Supreme Court held that the "[t]rust seeks a judicial determination that, if made, would necessarily be premised on uncertain and hypothetical facts and that ultimately may never become necessary."[107]  Thus, the plaintiff failed to "establish a 'reasonable likelihood' that coverage under the disputed policies will be triggered."[108]  Plaintiff did not plead

---

[103] *Id.*
[104] *Id.*
[105] *XL Specialty Ins. Co. v WMI Liquidating Tr.*, 93 A.3d 1208 (Del. 2014).
[106] *Id.* at 1211.
[107] *Id.* at 1218.
[108] *Id.* (citing *Hoechst Celanese Corp., v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1137 (Del. Super. 1992)).

that there was a reasonable likelihood the policies would be implicated, and thus any judgment would have been too speculative and based on "what-ifs."[109] "The Trust's only interest in having its dispute litigated [at the time was] apparently to receive judicial guidance about how much coverage *would* be available . . . *if* the Trust were to initiate litigation against them."[110] Without additionally pled interests, this was insufficient to support a finding of ripeness.[111]

Like in *XL Specialty*, the facts here are not yet concrete. Plaintiff asserted, among other things, that the failure to enroll more patients and the focus on PASCAL sufficiently shows that Defendants breached their ongoing duty to use "commercially reasonable efforts." Such activities, however, while potentially supportive of "unreasonable" efforts, are not completed activities, *i.e.,* the insufficient enrollment, while presently detrimental to Cardioband, is not static because the study itself has not yet been cancelled or stopped. Defendants may still complete the study in time to achieve the Milestone by the end of the Earn-Out Period in such a way that is "commercially reasonable."[112] Like in *XL Specialty*,

---

[109] *Id.* at 1219.

[110] *Id.* at 1220.

[111] *Id.*

[112] As Defendants pointed out during oral argument, "Your Honor, there is a world in which we litigate this case before Your Honor, we prevail on summary judgment, and in three or three and a half years from now, we are back before this court litigating the same issues of commercial reasonableness. That's inefficient. That's why this case is not ripe. That's why Edwards should get the ten-year earn-out period that it bargained for." *VT S'holder Representative, LLC v. Edwards Lifesciences Corp.*, C.A. No. 2023-0316, at 81 (Del. Ch. Sept. 27, 2023) (TRANSCRIPT).

Plaintiff here has not shown that there is a reasonable likelihood the Milestones will not be met.

Finally, the facts here are evolving, as evidenced by the number of changes to both Cardioband and PASCAL products that have occurred so far. Plaintiff asks the Court to make a premature decision and "inappropriately draw the [C]ourt into a granting of an advisory opinion" while the facts continue to change.[113] Of note, while the Milestones are targets, there is no guarantee that these Milestones will be met, even if Defendants consistently used "commercially reasonable efforts."[114] Defendants assert that they still may achieve the Milestones in the time remaining and thus this issue would never need to be litigated.[115] If Defendants fail to do so, then it would be appropriate for the Court to review all of Defendants' efforts to determine if they were "commercially reasonable"—to do so now would be premature.[116]

---

[113] *Stroud*, 552 A.2d at 481.

[114] Merger Agreement § 1.11(a) ("Each Contingent Payment made hereunder will, in each instance, be paid only once (if at all).").

[115] Defs.' Br. in Supp. of Defs.' Mot. to Dismiss at 15.

[116] *See Stroud*, 552 A.2d at 481. In *Stroud*, the court found a challenge to proposed charter and bylaw amendments were not ripe because the facts were not concrete, nor in any final form. *Id.* The court determined that the parties had "inappropriately drawn the trial court into the granting of an advisory opinion upon a significant question of corporation law." *Id.* at 481. Given the changing facts, and the facts' impact on any legal determination, the court held that the issue was not yet ripe. *Id.*

**2) Plaintiff has Not Presented a Current or Immediate Future Harm that Would Merit the Court Issuing a Declaratory Judgment.**

In the context of assessing a complaint for ripeness, the court will also consider the immediate or future harm suffered by plaintiff, and whether that harm outweighs the possibility of waiting until new facts arise, or changed circumstances occur.

Two cases from this Court, albeit in different contexts, provide guidance. In *MPT of Hoboken TRS, LLC v. HUMNC Holdco, LLC*,[117] plaintiff sought a declaratory judgment to declare a breach of an LLC's operating agreement.[118] Defendant argued that the claim was not ripe because plaintiff did not allege any current or imminent harm as a result of challenged operating procedures.[119] The court found that there was a sufficient risk of future harm, given that the dispute "places a cloud over the management" of the LLC.[120] Because of this risk, the court held that the claim was ripe.[121]

In *Solak v. Sarowitz*,[122] the stockholders sought a declaratory judgment to deem invalid certain fee-shifting bylaws.[123] Defendant argued that declaratory

---

[117] *MPT of Hoboken TRS, LLC v. HUMNC Holdco, LCC*, 2014 WL 3611674 (Del. Ch. July 22, 2014).
[118] *Id.* at *8.
[119] *Id.*
[120] *Id.* at *8–9.
[121] *Id.*
[122] *Solak v. Sarowitz*, 153 A.3d 729 (Del. Ch. 2016).
[123] *Id.* at 733.

judgment was not ripe because there was no action filed to trigger the challenged bylaws, and there was no indication of plaintiff's intention to file such a suit.[124] Despite no pending litigation, the court determined that the stockholders did face an immediate harm as a result of the fee-shifting bylaws.[125] The bylaws created a personal liability that would render it "highly unlikely that any rational stockholder" would challenge the bylaw.[126] When challenged procedures have a substantial deterrent effect, like the fee-shifting bylaws did, they are ripe for review.[127] The court further noted that declining review could also "encourage other corporate boards to adopt similar bylaws to take advantage of their potent deterrent effect on stockholders without regard to whether such provisions are legally permissible."[128]

This case is distinguishable from *HUMNC Holdco* and *Solak*, where the existence of present or future harm created an issue ripe for judicial determination. Unlike in *Solak*, where the court found the present harm of the problematic bylaws was to create a deterrent effect on the shareholders asserting their rights, here, there is no present harm facing plaintiff. In *HUMNC Holdco*, the court found that the lack of clarity surrounding the LLC's operating agreement created a sufficient "risk of future harm" because the dispute impacted management capacity.[129] Here, there is

---

[124] *Id.* at 737.
[125] *Id.* at 738–39.
[126] *Id.* at 737–38.
[127] *Id.* at 738.
[128] *Id.*
[129] *HUMNC Holdco*, 2014 WL 3611674, at *8–9.

no present or immediate future harm other than the Plaintiff will not receive its Earn-Out Consideration immediately. This "harm" is insufficient because even if Defendants are using "commercially reasonable efforts," the Merger Agreement created the risk that Plaintiff would wait ten years before receiving the Milestone payouts, if ever. Without additional harm alleged, Plaintiff fails to show why they are entitled to declaratory relief.

Here, Plaintiff requests damages in the amount it would be owed if the Milestones had been completed.[130] If the Court does not find the issue ripe, there are two potential outcomes. One, Defendants could achieve all the Milestones and pay the consideration, rendering any challenge for damages moot.[131] Two, Defendants could fail to achieve some or all the Milestones and Plaintiff could *then* claim Defendants failed to use "commercially reasonable efforts." At that time, the Court may find that, despite not meeting the Milestones, Defendants did use "commercially reasonable efforts" and therefore Plaintiff has no grounds to recover. Alternatively, if the Court finds Defendants failed to use "commercially reasonable efforts" then Plaintiff would recover the *exact same* damages sought in the present

---

[130] Compl. at 48–50.

[131] *See, e.g.*, *Klein v. ECG Topco Hldg., LLC*, 2022 WL 2659096, at *4 (Del. Ch. July 8, 2022) ("Regardless of the internal inconsistency of having to pay off the principal balance of a note before its issuance, the plaintiffs have not been harmed by any non-payment of the Triggering Event Purchase Price—however defined—because payment is not yet due. . . Judicial intervention may ultimately prove unnecessary.").

lawsuit: the amount of the Earn-Out Consideration, together with costs, prejudgment interest, and reasonable attorneys' fees.

If the Court were to review this issue as it is currently presented and find that Defendants have failed to use "commercially reasonable efforts," it is unclear how paying the consideration early would impact the Merger Agreement and the parties' ongoing relationship. The Court need not predict or consider future business decisions. If the Defendants are proceeding toward completing the Milestones and must pay the consideration early, Defendants may be vulnerable to another challenge in the future, should their strategy change as a result of the reduced capital available. These hypotheticals reinforce that there are still too many contingent and changing circumstances for the Court to deem the issue ripe.[132]

### 3) Despite Some Factual Similarities, *Alexion* is not Dispositive of All Ripeness Challenges in Earn-Out Cases.[133]

Plaintiff relies heavily on this Court's recent decision in *Shareholder Representative Services, LLC v. Alexion Pharmaceuticals, Inc.*[134] In *Alexion*,

---

[132] The Court in *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.* noted that when there are many possible outcomes the issue is not ripe because of the many possibilities that could occur without necessitating judicial intervention. *Hexion Specialty Chems. Inc. v. Hunstman Corp.*, 965 A.2d 715, 758 (Del. Ch. 2008). *See also B/E Aerospace, Inc.*, 2020 WL 4195762, at *6 (finding unripe a claim for remediation damages wherein multiple possibilities could occur, including the need for remediation, and the lack of need).

[133] The depth at which the Court reviews *Alexion* should not suggest any priority or importance of this case over others, but instead the Court addresses the distinctions between the present case and *Alexion* because of the amount *Alexion* was addressed in both briefings and during oral argument.

[134] 2021 WL 3925937 (Del. Ch. Sept. 1, 2021).

Alexion Pharmaceuticals ("Alexion") and Syntimmune Inc. ("Syntimmune") entered into a merger agreement wherein Alexion acquired a pharmaceutical candidate to treat rare autoimmune diseases.[135] The merger agreement included "Milestone Events" wherein Syntimmune was entitled to Earn-Out Payments when and if Syntimmune achieved certain targets.[136] Alexion agreed to use "commercially reasonable efforts" to achieve the Milestones within the first seven years of the closing.[137] Two years after the closing date, Syntimmune's pre-merger stockholders (the "Shareholders") asserted that Alexion failed to use "commercially reasonable efforts" to achieve the milestones.[138] Alexion responded that the claim was not yet ripe because there were five years remaining.[139] Alexion also raised a claim against Shareholders for indemnification for "allegedly defective batches of drug product it received from Syntimmune."[140]

The court found that despite the seven-year agreement, the claim for breach of contract was ripe because "the claim depends only on Alexion's *past* conduct."[141] The court found unpersuasive Alexion's argument that they could still achieve the Milestone Events despite their previous lapse because that "conflates [Alexion's]

---

[135] *Alexion*, 2021 WL 3925937, at *1.
[136] *Id.*
[137] *Id.* at *2.
[138] *Id.* at *3.
[139] *Id.* at *4.
[140] *Id.* at *3–4.
[141] *Id.* at *6 (emphasis in original) (noting that the breach of a contract accrues at the time of the breach).

obligation to pay upon certain results, at any time, with its obligation to pursue those results with a certain amount of diligence for a period of time."[142]  The failure to meet the "commercially reasonable efforts" could "be determined on a record developed from currently available evidence."[143]  Unlike a long-term result, the "commercially reasonable efforts" clause of the merger agreement required "persistent efforts for the entire contractual seven-year period."[144]  Alexion's past failure to exercise "commercially reasonable efforts" could not be cured by future efforts that met the standard.  "Alexion's substandard past efforts are static, and that breach can be adjudicated now."[145]

Here, Plaintiff relied on *Alexion* to show that a claim can be ripe prior to the end of an agreed-upon Earn-Out Period.[146]  While true that the court in *Alexion* held that there *can* be a ripe claim prior to the end of the Earn-Out Period, the Court is not *required* to find ripeness if the relevant facts suggest otherwise.  Delaware takes

---

[142] *Id.*

[143] *Id.* (quoting *Williams v. Ji*, 2017 WL 2799156, at *4 (Del. Ch. June 28, 2017)).

[144] *Id.*

[145] *Id.* (basing this determination, in part, on the concession by Alexion that they had already failed to use "commercially reasonable efforts").

[146] Pl's. Opp'n to Defs.' Mot. to Dismiss at 40–41 ("Defendants do not cite a single case in which a court concluded that claims were not ripe because the earnout period had not yet expired.  They also conspicuously ignore that the Court rejected the same ripeness argument in an earnout case fewer than two years ago.").

an objective approach to interpreting contracts,[147] and consistently gives great weight to the language to which the parties negotiated.[148]

Similar to *Alexion*, the Parties here entered into a Merger Agreement with specific milestones, with identified pay-out amounts for if, and when, those milestones were met, and a requirement to use "commercially reasonable efforts." Both Defendants here and the defendants in *Alexion* were sued for their conduct prior to the completion of the Earn-Out Period. The court in *Alexion* held that even if there was time remaining, the court could consider the past conduct of the Defendants to determine if they used "commercially reasonable efforts" up until that point.[149] Therefore, the fact that the earn-out period had not ended was not determinative of ripeness.

There are four crucial distinctions between this case and *Alexion*. First, Alexion did not dispute that a breach of the "commercially reasonable efforts" provision had occurred prior to the suit.[150] The Court can assume that Alexion's concession regarding the breach of "commercially reasonable efforts" assisted the

---

[147] *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *15 (Del. Ch. Feb. 27, 2020) ("The objective theory of contracts requires that a court 'give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'") (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)). *See also S'holder Representative Servs. LLC v. Albertsons Co.*, 2021 WL 2311455, at *6 (Del. Ch. June 7, 2021).

[148] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("When interpreting a contract, the role of a court is to effectuate the parties' intent.").

[149] *Alexion*, 2021 WL 3925937, at *6.

[150] *Id.* at *4.

court in *Alexion* in finding the issue ripe—without such a concession here, this Court cannot take that step. Unlike in *Alexion*, where the court found promises of future conduct insufficient to overcome failures in past conduct,[151] here, Defendants did not admit or concede that their past conduct fell below the required threshold.

Second, *Alexion* discussed the practical benefits of finding ripeness, noting that "[i]t is also sensible to determine whether Alexion breached the Merger Agreement before faded memories, lost evidence, or other practical hurdles frustrate that effort."[152] Such language instructs this Court that similar practical concerns weigh in favor of a review of the facts now, but these examples are not the only practical considerations. In *Alexion*, even if the court found that the Earn-Out issue was not ripe, the case still would have proceeded on the indemnification claim which dealt with overlapping factual issues.[153] The court held that "[a]djudicating claims with these overlapping factual issues at one time ma[de] practical sense and further[ed] the ideals of judicial economy the ripeness doctrine advances."[154] Here, there are no separate claims to be litigated that are not tied to the Earn-Out provision, so the practical benefit of dealing with like issues together does not apply. The Plaintiff has not identified why any other practical limitations, including "lost

---

[151] *Alexion*, 2021 WL 3925937, at *6. ("The facts supporting SRS's claim are static because the claim depends only on Alexion's *past* conduct.").
[152] *Id.* at *7.
[153] *Id.*
[154] *Id.*

evidence" or "faded memories," is of particular concern here if Plaintiff has to relitigate these issues at the end of the Earn-Out period, nor does the Court see a reason for such concern.

Third, Alexion "discontinued or abandoned" its efforts to achieve the milestones at the time of the suit.[155] While Plaintiff argued Defendants here failed to make reasonable progress, they did not plead that Defendants abandoned their efforts entirely. The act of abandonment creates a definitive point in which a Court can assess past actions for commercially reasonable efforts—distinct from ongoing efforts—no matter how deficient those efforts may be. Here, while Plaintiff compared the minimal effort to improve Cardioband with PASCAL's advancements, Plaintiff did not allege that the efforts have been completely abandoned or ceased. Without complete abandonment by the Defendants, the Court finds the efforts are ongoing and therefore not yet ripe, especially when the Merger Agreement provides that the Milestones can be achieved at any point "on or prior to the last day of the Earn-Out Period."[156]

Fourth, the Merger Agreement in this action includes timeliness language distinct from *Alexion*. Here, the Merger Agreement includes the provision that upon completion of the milestones "on or prior to the last day of the Earn-Out Period"

---

[155] *Id.* at *3.
[156] Merger Agreement § 1.11(b)–(d).

Defendant will pay the Earn-Out Consideration amount.[157] *Alexion* did not have comparable language that suggests to this Court that the Defendants had until the "last day of the Earn-Out Period" to achieve the milestones. Delaware Courts consistently give high deference to the language of the contract itself; "[w]hen a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[158] Further, "[t]he parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[159] Despite the parties' dispute about the meaning of the provision "on or prior to the last day of the Earn-Out Period," the Court determines that it is not an ambiguous phrase.[160] The Court will give attention to all words in a contract, and finds that this phrase further distinguishes *Alexion*. The reasoning in *Alexion* is based on the concession to a breach and the fact that the breach is based on past conduct; language specifically allowing completion "on or prior to the last day of the Earn-Out Period"

---

[157] *Id.*

[158] *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021) (internal quotations omitted). *See also Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015) ("This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements . . . [O]ur courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering[.]").

[159] *Manti*, 261 A.3d at 1208 (internal quotations omitted).

[160] *Compare VT S'holder Representative, LLC v. Edwards Lifesciences Corp.*, C.A. No. 2023-0316, at 61 (Del. Ch. Sept. 27, 2023) (TRANSCRIPT) ("[T]hat just simply says you have the earn-out period, right? It doesn't—I don't think the [phrase] is dispositive, because that simply says you have the whole period to achieve the earn-out, which is always the case when you have an earn-out.") (Plaintiff's interpretation), *with id.* at 74. ("In light of the time limits that the parties agreed to in this merger agreement, they're not ripe. . . . Nobody's disputing that the parties agreed we would have until on or prior to the last day of the earn-out period to achieve these milestones.") (Defendants' interpretation).

is not considered because it did not exist. Here, this Court cannot ignore the contract's explicit language to determine if, and when, a breach can occur.

## B.   FAILURE TO STATE A CLAIM[161]

Defendant additionally argues that Plaintiff failed to state a claim pursuant to Court of Chancery Rule 12(b)(6).[162] The Court will not address this argument because, without a claim ripe for judicial adjudication, the Court does not have jurisdiction under the Declaratory Judgment Act.[163] Because this action may yet ripen into a justiciable controversy, the Court will not review the merits of any claims at this time, pending future developments where Plaintiff may proceed under similar claims.[164]

---

[161] The Court notes Plaintiff's assertion in oral argument on October 27, 2023, that by demonstrating Defendants' failure to use commercially reasonable efforts—and consequently stating a sufficient claim on all counts—it has proven that the claim is ripe for review. "If I can allege a breach, then it should be ripe." *Id.* at 49. This Court rejects that argument as circular and instead finds that it is too soon to determine the case on the merits for the reasons detailed, and therefore regardless of any well-pled allegations suggesting a potential for future claims of breach of contract, the fact that the claims are not yet ripe precludes the Court from considering the merits.

[162] Ct. Ch. R. 12(b)(6).

[163] *See, e.g.*, *Tygon Peak Cap. Mgmt., LLC*, 2022 WL 34688, at *7 ("I address subject matter jurisdiction first, as I can only substantively review the pleadings if I have jurisdiction to do so."); *Stone Energy Corp.*, 2006 WL 2947483, at *6–7.

[164] *See, e.g.*, *Bebchuck*, 902 A.2d at 745.

## VI.    CONCLUSION

In conclusion, Defendant's Motion to Dismiss is GRANTED pursuant to Court of Chancery Rule 12(b)(1).  As such, Defendants' Motion to Dismiss pursuant to Court of Chancery Rule 12(b)(6) is moot.

**IT IS SO ORDERED.**

*/s/ Meghan A. Adams*

**Meghan A. Adams, Judge**